**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

CINDY COLE, PATSY BAYNARD, MARTA FARRELL, DIANE GIACOMOZZI,
KIMBERLY KULLEN, and MICHAEL DONMOYER,

      Plaintiffs,

v.

QUANTA SERVICES, INC. and QUANTA POWER GENERATION, INC. and its related
entities, including QUANTA POWER, INC.

      Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiffs Cindy Cole, Patsy Baynard, Diane Giacomozzi, and Kimberly Kullen, through

their attorneys, Paula Greisen and Meredith A. Munro, of the law firm of KING & GREISEN, LLP,

and Michael DonMoyer and Marta Farrell, through their attorney, Peter G. Friesen, of the law

firm of Roberts Levin Rosenberg, submits this Complaint and Jury Demand against Defendants

as follows:

## I.   INTRODUCTION

1.      Plaintiffs bring this action against the Defendants for gender discrimination and

retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, *et seq.*  Certain Plaintiffs also bring claims under Colorado law for termination in

violation of the public policy of Colorado prohibiting discrimination based on gender, abuse of

process, and malicious prosecution.

2.      The principal Defendants in this case are businesses involved in the construction of utility scale energy generation projects.  For a period of roughly three years (2011-2013), female executive employees played a major authoritative role in the management of these projects and the operations of Defendant Quanta Power Generation, Inc. ("QPG").  They were placed in those roles in large part through the efforts of Plaintiff Michael DonMoyer, with the approval of then CEO Christian Laursen, who oversaw and supported the work they performed. Their presence was a source of irritation and concern to other senior executives of these Defendants.  This irritation had nothing to do with their qualifications, their capabilities or the discharge of their responsibilities, but with the fact that they were women, and as such unwelcome in authoritative roles related to construction projects and construction organizations.

3.      Despite the success achieved by the Plaintiffs, in March 2013, Defendants hired John McCann as the new CEO of QPG, a position that had been promised to Plaintiff DonMoyer.  Upon his arrival, McCann explained that he was hired to "rectify" perceived problems related to the presence of executive level women at QPG.  In accordance with Defendants' wishes, McCann then proceeded to orchestrate the employment termination of all of Mr. DonMoyer's senior female executives either without warning or against Mr. DonMoyer's protests, and for frivolous reasons, in all but one case replacing them with men.  Mr. DonMoyer had resisted the mistreatment of these women at Quanta construction sites before McCann arrived, and resisted their systematic termination after McCann's arrival.   Mr. DonMoyer's employment was terminated without warning in September 2013.

4.      At all times relevant in this Complaint, McCann was acting as the agent of Defendants.

**II.**
**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

6.     This action is authorized and instituted under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events giving rise to the claims alleged herein, including the unlawful employment practices, occurred within the jurisdictional boundaries of the United States District Court for the District of Colorado.

8.     The Plaintiffs met all procedural prerequisites under 42 U.S.C. § 2000e-5(f)(1) for filing their Title VII claims against the Defendants.  Each of them filed timely Charges of Discrimination alleging discrimination and retaliation against the Defendants with the Equal Employment Opportunity Commission ("EEOC") and received findings of probable cause. Defendants refused to participate in the EEOC conciliatory process,  and Plaintiffs subsequently requested Notice of Right to Sue letters.  The Plaintiffs have not yet received their Right to Sue letters, but expect that they will be received shortly.  Accordingly, this Complaint and Jury Demand is being filed within 90 days of the issuance of the Notice of the Right to Sue letters from the EEOC.

**III**.
**PARTIES**

9.     Plaintiff Patsy Baynard is a resident of California and was a Colorado resident during the relevant times alleged in this Complaint.

3

10.     Plaintiff Cindy Cole is a resident of Colorado and was a Colorado resident during the relevant times alleged in this Complaint.

11.     Plaintiff Marta Farrell is a resident of Massachusetts and was a Colorado resident during the relevant times alleged in this Complaint.

12.     Plaintiff Diane Giacomozzi is a resident of Colorado and was a Colorado resident during the relevant times alleged in this Complaint.

13.     Plaintiff Kimberly Kullen is a resident of Texas and was a Colorado resident during the relevant times alleged in this Complaint.

14.     Plaintiff Michael DonMoyer is a resident of Colorado and was a Colorado resident during the relevant times alleged in this Complaint.

15.     At all relevant times, Plaintiffs were "employees" within the meaning of 42 U.S.C. § 2000e.

16.     Defendant Quanta Services, Inc. ("Quanta Services") is a Delaware corporation with a principal place of business in Texas.

17.     Defendant Quanta Power, Inc. ("QPI") is a Delaware corporation with a principal place of business at 5445 DTC Parkway, Suite 1200, Greenwood Village, Colorado, 80111.  It is a wholly owned subsidiary of Quanta Services.  While it keeps its own financial records, it is treated by Quanta Services as a division, and is directly managed by Quanta Services.

18.     Defendant Quanta Power Generation, Inc. ("QPG") is a Delaware corporation with a principal place of business at 5445 DTC Parkway, Suite 1200, Greenwood Village, Colorado, 80111.  It is a wholly owned subsidiary of Quanta Services, either directly or as a subsidiary of QPI.

19.     At all relevant times, all Defendants have continuously been doing business in the State of Colorado both individually and collectively, and each Defendant has continuously had at least fifteen (15) employees.

20.     At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## IV.
## ALLEGATIONS

***There Exists an Alter Ego, Single Employer, and/or Joint Enterprise Relationship Between and Among Defendants.***

21.     Quanta Services is a conglomerate consisting of over one hundred wholly owned subsidiaries, which it manages from its home office in Houston, Texas.  Quanta Services advertises itself on its public company website (www.quantaservices.com) as "[a]s a team of entities operating with the efficiencies of one powerful company."

22.     Through its network of subsidiaries, Quanta Services provides outsourced engineering, procurement, and construction ("EPC") services for electric power and oil and natural gas industries.

23.     Defendants QPG and QPI are wholly owned subsidiaries, directly or indirectly, of Quanta Services ("Subsidiary" or "Subsidiaries").

24.     During the relevant time period, Quanta Services chose the board members for QPG and QPI and placed officers of Quanta Services on their Boards of Directors.  There were no board members of the QPG or QPI Board that were not also executive officers or employees of Quanta Services or one of its other subsidiaries.  When QPG was formed, it was formed by

Quanta Services from a division of Quanta Services, where all of the employees of the newly formed legal entity had previously been employees of Quanta Services or one of its related entities or subsidiaries.

25.     During the relevant time period, Quanta Services selected and/or approved the CEOs and/or Presidents of QPG and QPI.  Quanta Services also determined and/or approved the bonus compensation program of all senior executives reporting to the CEOs and/or Presidents of QPG and QPI.

26.     During the relevant time period, Quanta Services set the performance standards for QPG and QPI and its senior executive officers.

27.     During the relevant time period, Quanta Services awarded its stock to executive officers of QPG and QPI as compensation.  Stock and cash bonus incentives were either determined and/or approved by Quanta Services, both as to the pool of stock and cash available for distribution, and for each QPG and QPI employee recipient of stock and cash bonus incentives.

28.     During the relevant time period, Quanta Services placed spending and contract negotiation limits on individual officers and employees of QPG and QPI, which could not be exceeded without approval from Quanta Services.

29.     During the relevant time period, Quanta Services dictated the markup over costs of projects bid by QPG and QPI, and it explicitly precluded markup over cost where cost included subcontracting with another Quanta Services subsidiary.

30.     During the relevant time period, Quanta Services provided all legal counsel on matters of contract negotiation and corporate litigation to QPG and QPI.  Marta Farrell was hired

by QPI/QPG for contract negotiation and general legal services, and  reported directly to counsel for Quanta Power Generation.  Quanta Services continued to direct and control all matters pertaining to litigation with QPG and QPI.

31.     During the relevant time period, Quanta Services provided authorization for the coordination and contract of working relationships and agreements among subsidiaries, including QPG and QPI, and it regularly intervened in the event there was conflict or dispute between subsidiaries.

32.     During the relevant time period, Quanta Services transferred to its own accounts all cash assets earned by QPG and QPI that were not necessary for the daily operations of those entities' businesses.  QPG and QPI were likewise bonded by Quanta Services.

33.     During the relevant time period, Quanta Services provided parent guarantees for contracts entered into by QPG, including leases for offices and other real property necessary to the operation of QPG and QPI.

34.     On information and belief, during the relevant time period, certain directors and officers of QPG and QPI failed to act independently and in the best interest of the particular Subsidiary, acting instead in Quanta Service's best interest.

35.     During the relevant time period, certain executive officers of QPG and QPI directly reported to executive officers of Quanta Services or other subsidiaries, and Quanta Services caused the lateral transfer of executive officers between and among itself and its subsidiaries.

36.     Quanta Services and its Subsidiaries QPG and QPI utilize a centralized control of labor relations.  For example, Quanta Services requires that all of its employees, including

Subsidiary employees, comply with the same Code of Ethics and Business Conduct of Quanta Services.  Among other requirements, the Code mandates employee loyalty to "Quanta." Subsidiary employees are directed to contact Quanta Services' ethics help line in the event of a suspected violation of any ethical standard, rule or regulation, including sexual harassment.

37.     Quanta Services and its Subsidiaries QPG and QPI share certain key services, like accounting, human resources, and information technology support services.

***Background of Discrimination Engaged in by Defendants.***

38.     QPG primarily focuses on providing services in the fields of solar, natural gas, energy storage, fuel cell technology, and biofuels.

39.     Michael DonMoyer was hired in 2010 as Executive VP of QPG.  Mr. DonMoyer's direct report at that time was Laursen, Chief Executive Officer of QPG[1].  Laursen, in turn, reported directly to Ken Trawick president of yet another Quanta Services subsidiary. After Trawick's retirement, Laursen reported to Randall Wisenbaker, Quanta Services Executive VP of Operations.

40.     In mid-2011, the decision was made to formulate an aggressive plan to expand QPG's current EPC model to serve other technologies in the power market such as natural gas. To effectuate that plan, Quanta Services promoted Mr. DonMoyer to President of QPG and stated that he would become the CEO in June 2013, when Laursen retired.  That plan was recorded in a succession planning document, submitted as part of the business planning process, and distributed to Quanta Services senior management team through Trawick and others.

_____

[1] Quanta Services subsequently moved Laursen, Cindy Cole, and the rest of the human resources and administrative staff to QPI.

41.     As President, Mr. DonMoyer helped put together an executive team that included the Plaintiffs, Mmes. Cole, Baynard, Giacomozzi, Kullen, and Farrell.

42.     By the spring of 2013, QPG was considered an industry leader, named one of the top five solar EPC firms by Solar Power World, the industry's leading source for technology, development and installation news.  QPG was in the process of entering into the bidding and management of natural gas projects, and it had been selected for two such major projects.  It was ahead of its ambitious plan of achieving $1 billion in annual gross revenues, and it was doing well on the margins it was receiving on the projects it bid.

43.     Despite the fact that QPG was positioned for success, management at the highest level of Quanta Services became involved in a concerted effort to eliminate every single woman from QPG's senior executive staff.  These women were highly experienced, well-respected in their fields, and valued by their direct reports during their tenure.

44.     Mr. DonMoyer had a close working relationship with the other named Plaintiffs, all of whom are female.  He recruited or approved their hire, and he supervised and mentored them in their job roles.  All except Ms. Cole reported directly to him, and he worked directly and daily with each of them, including Ms. Cole.  The success of the bidding, auditing, management, and construction of energy projects he controlled was inextricably related to the working relationships he developed with the female senior executives named as Plaintiffs in this action. He was therefore within the zone of interest of the protected class of female employees also bringing suit in this complaint.

9

***Defendants' Gender Discrimination and Retaliatory Termination of Ms. Cole's Employment.***

45.     As the Director of Human Resources, Ms. Cole was in a unique position to directly witness (as well as to be the subject of) the discriminatory atmosphere that pervaded Quanta Services and its Subsidiaries, QPG and QPI.  She complained about the gender discrimination and was the first woman McCann fired.

46.     Ms. Cole was hired in February 2012 as Human Resources Manager for QPG, directly reporting to Tony Spagnola, Chief Financial Officer for QPG.  Within months, Ms. Cole was promoted to Director of Human Resources for QPG and three other Quanta Services subsidiaries, and she reported directly to Laursen.  During Ms. Cole's tenure, Laursen gave her two merit pay increases and, in March 2013, he stated that Ms. Cole was *the best human resources professional he had ever worked with.*

47.     One of Ms. Cole's duties was to ensure that Defendants' construction sites in California were in compliance with the company's policies.  In March of 2012, she visited one site where her presence was announced via radio to employees as, *"Mike Hunt is at the gate. Mike Hunt is at the gate,"* *pronounced My Cunt*.  This practice of derogatorily referencing women by their genitalia (or "Mike's" ownership thereof) was apparently common at Defendants' construction sites.

48.     The General Superintendent of the California sites, Dave Dzeima, shrugged off this offensive behavior, asserting that *"the guys needed something to lighten things up"* at the site.

49.     Ms. Cole made suggestions to correct inconsistencies in the per diem policy at one of the California sites to Spagnola, Dzeima, and Jack Cowart, the Vice President of Quanta

Service's subsidiary The Ryan Company.  These men discredited her work, however, and refused to follow her proposals.  They told employees at the construction sites that *as a woman, she did not understand the construction business*.  Despite their objections, the changes in the per diem policy were approved by Laursen, DonMoyer, and Ernest Teague, QPG Executive VP of Construction, and then implemented.  When the higher rate of pay for per diems were announced, Dzeima and Cowart falsely told employees that it "was about time" that Quanta approved *their* recommendations for higher pay.

50.    In February 2013, Ms. Cole conducted a management training meeting on a supervisory manual that she was updating at the request of Teague.  Dzeima and QPG Electrical Superintendent Kevin Carlson were openly hostile to her at the meeting, repeatedly interrupting her with statements such as, "*Do you know what it takes to work out here*," and "*Don't you know these policies and new quality forms are bullshit*?"  At one point during the meeting, Carlson blurted out in a raised voice, "*We get the job done and we don't have to answer to women in corporate over it.*"

51.    Around this time, Ms. Cole conducted a market analysis for job descriptions companywide, to ensure equitable pay among the employees.  The market analysis required another female human resources manager to go to the construction sites with an escort to review and document employees performing their duties.  When Dzeima learned of the market analysis, he forbade anyone on the site from escorting the female human resources manager.  Ms. Cole was only able to complete the market analysis with the help of a male QPG construction manager who did so covertly for fear of losing his job.  Dzeima was overheard telling a group of

superintendents, "*I was telling Jack [Cowart], what are we going to do, let all the women in Denver run this company or are we going to run this company*?"

52.     Shortly thereafter, Carlson sent out an offensive group text message calling the female African American human resources manager who was engaged to a Caucasian construction manager as a "*money grubbing hussy*" who should be sent to "*a cement pond*."

53.     Ms. Cole compiled the findings of her investigation of the California construction sites in an Executive Summary which she presented to Laursen and Mr. DonMoyer in April of 2013.  In her summary, she detailed significant violations of the company's policies.  Notably, Ms. Cole reported several instances that she felt amounted to discrimination based on gender.

54.     Both Laursen and Mr. DonMoyer supported Ms. Cole and took disciplinary action against those who had participated in the discriminatory conduct, including Dzeima and Cowart. Dzeima was fired and Cowart was removed from his position with QPG and transferred to The Ryan Co.   Cowart was not terminated due to his long tenure with Quanta Services companies and close ties with Quanta Services senior management.

55.     This disciplinary action against these long-term male employees apparently angered the executive management at Quanta Services.

56.     Within weeks, Quanta Services announced that John McCann, who had previously been fired for cause from a Quanta Services subsidiary by Trawick and now CEO James O'Neil, would be replacing Laursen as the new CEO of QPG, instead of Mr. DonMoyer. This was done without warning to either Laursen or Mr. DonMoyer.

57.     Shortly after McCann became the CEO in April 2013, Laursen found him watching pornography during work hours on his work computer.  McCann did not try to hide the pornography; instead, he made sexual jokes about women to Laursen and encouraged him to watch the pornography with him, which Laursen declined to do.

58.     In one of his first conversations with Mr. DonMoyer in April 2013, McCann boasted that he was from New Jersey and accustomed to the use of "mafia tactics" in business. He explicitly stated that the top management at Quanta Services, including President and CEO Jim O'Neil and Chief Operating Officer Duke Austin, thought there were too many women at QPG for a construction company.

59.     McCann informed Mr. DonMoyer that he intended to fix the "*problem*" of having too many female employees, and that, like the Quanta Services executives, he believed that women "*do not belong*" in the construction industry.  McCann told Mr. DonMoyer that Mr. DonMoyer was perceived by Quanta Services as being a cause of the problem because of his support of the female senior executives at QPG.

60.     During his first month as CEO, McCann met with the men whom Ms. Cole reported as engaging in discriminatory conduct, including Cowart.  McCann refused to meet with the female directors at QPG, although he met with their male subordinates.

61.     On Friday, May 17, 2013, Cowart wrote to McCann criticizing Ms. Cole and requesting an investigation into Dzeima's termination.

62.     The Tuesday following Cowart's memo, McCann informed Ms. Cole that she was no longer to report directly to him, but instead to Spagnola.  This was clearly a demotion despite the fact that McCann did not raise any problems with Ms. Cole's job performance.  When Ms.

Cole asked McCann whether she should go to Spagnola with information related to her investigation of management misconduct, including Carlson's racist and sexist group text message, McCann stated, *"you can't prove anything"* and *"you can't make this stick."* He then threatened Ms. Cole's employment: *"Speaking of firing people, I understand the state of Colorado is an at will state and I don't have to have a reason to fire anyone."* McCann told Ms. Cole that in the past when he wanted to fire an employee, he would just give the employee the option to resign with two week's pay, and then send the employee on his or her way.

63.     McCann subsequently made good on his threat, and terminated Ms. Cole's employment on June 4, 2013, without conferring with Mr. DonMoyer or Laursen (who remained at QPI as a consultant).  McCann did not provide Ms. Cole any reason for the termination.

64.     Quanta Services never filled Ms. Cole's director-level position.   Upon information and belief, the day after Ms. Cole's termination, Spagnola informed two lower-level employees in human resources that all policies and practices of questioning unequal pay were "*done.*"

***Defendants' Discriminatory Conduct towards Ms. Baynard and the Retaliatory Termination of her Employment.***

65.     Defendants next fired Ms. Baynard without explanation.

66.     Ms. Baynard was hired as Director of Project Management for QPG in May of 2011.  She had been recommended as a candidate to QPG by another Quanta Services subsidiary with glowing recommendations.  At QPG, she reported to Mr. DonMoyer, who was very happy with her performance, as demonstrated by her raises and bonus.

14

67.     Ms. Baynard was responsible for the project managers who managed the scope, schedule and cost for the execution of EPC power generation facilities and associated distribution, transmission and substation facilities.

68.     Ms. Baynard experienced repeated acts of gender discrimination from other male managers of Quanta Services and its Subsidiaries.

69.     By way of example, in October of 2011, Ms. Baynard contacted a project manager on a plant site to inform him that she was aware that the control barriers on the plant site had failed after extensive rainfall and were in need of repair.  That same day she received a call from Craig Bradley, President of The Ryan Co., and Cowart (QPG VP of Construction).  In raised voices, they told her she did not know what she was doing.

70.     In the spring of 2012, Ms. Baynard was advised by a project manager on her team that a solar plant site had graded over protected wetland areas, which violated the site's water quality control permit.  Again, Cowart expressed resentment at her involvement and sidelined her efforts to remedy the problem.

71.     Similarly, in January 2013, a male site supervisor criticized Ms. Baynard's attempts to remedy problems on a job site, dismissively calling her "*babe*" during a staff meeting. Ms. Baynard complained about this behavior to human resources and was told that the offending male supervisor's direct report, Joe Flaherty, QPG VP of Operations, would be informed and would handle the issue.  Upon information and belief, Flaherty did not reprimand the male supervisor however, undermining Ms. Baynard's authority.  Indeed, Flaherty made it clear that he disapproved of Ms. Baynard's complaint to human resources, as set forth immediately below.

72.     Soon thereafter, in April 2013, McCann was brought in by Quanta Services as CEO of QPI.  Flaherty told Ms. Baynard that he intended to meet with McCann and fill McCann in on "*what was going on*" so McCann could "*clean this place up*," which Ms. Baynard understood to mean terminate senior women employees.

73.     McCann never met with Ms. Baynard.  However, McCann immediately met with the male directors and even lower-level male project managers who reported to her.

74.     During a business conference in Hawaii in May of 2013 (to which Ms. Baynard was not invited despite her director-level title and responsibility for QPG project management), McCann told other male members of the management team about Defendants' plan to get rid of the women at QPG.

75.     Shortly thereafter, several of Ms. Baynard's main work responsibilities were removed.  McCann began to deal with her subordinates directly, circumventing Ms. Baynard's authority.

76.     In July of 2013, over Mr. DonMoyer's objections, McCann caused QPG to terminate Ms. Baynard's employment as of August 1.  Mr. DonMoyer argued with McCann regarding the termination, and eventually convinced a reluctant McCann to agree to a consulting agreement with her.  Although she was told she would be kept on as a consultant for one year, the consulting agreement she was offered and accepted did not provide a set number of hours, and she was told that she was not allowed to work in the office when McCann was there.  On one occasion, McCann saw Ms. Baynard in the office and went to Mr. DonMoyer's office, closed the door, and scolded him saying word to the effect that, *"I don't ever want to see that women's face in here again."*  Ms. Baynard was given McCann's schedule on a weekly basis to determine

16

when she could be in the office and when she was to work from home.  After only a couple of weeks, on August 16, McCann caused her consulting agreement to be terminated.

77.     Ms. Baynard's duties were distributed to two male executives.

***Defendants' Discriminatory Conduct towards Ms. Kullen and the Retaliatory Termination of her Employment.***

78.     Shortly after firing Ms. Baynard, Defendants terminated Ms. Kullen, even though the company's safety record had markedly improved during her employment.

79.     Ms. Kullen was hired in June of 2012 as Manager of Health and Safety at QPG. In her only performance review with the company, Ms. Kullen's direct report, Teague (QPG Executive VP of Construction) gave her a glowing performance review, a bonus, and a salary increase.

80.     Ms. Kullen experienced repeated acts of gender discrimination from male managers at Quanta Services and its Subsidiaries, QPG and QPI.

81.     By way of example, Cowart (QPG VP of Construction), constantly undermined Ms. Kullen's authority with her staff, making it extremely difficult to complete her job duties. Cowart would frequently meet with Ms. Kullen's direct reports to find out what she was doing and advised them that they should report to him before beginning work on the projects she had assigned to them.

82.     Ms. Kullen was the only safety manager at Quanta Services and its Subsidiaries who had direct reports but was not part of the executive staff.

83.     In January 2013, Ms. Kullen was reassigned to report directly to Cowart.

84.     When Quanta Services re-hired McCann in April of 2013 to fix the "*problem*" of having too many female employees, McCann did not meet with Ms. Kullen until four months

after his arrival.  At a meeting in August, arranged at the insistence of Mr. DonMoyer, McCann dismissed Ms. Kullen's 19 years in the construction business as meaningless and intimated that she had little value as an employee.

85.     On September 8, 2013, Ms. Kullen was called into a meeting and abruptly told that she was being terminated.  She was not given a reason.

86.     When Mr. DonMoyer protested the termination of Ms. Kullen to McCann, McCann responded to the effect that the head of Quanta Services corporate safety does not like that woman and wants her out.

87.     After Ms. Kullen's termination, Defendants contended that Ms. Kullen's position was "eliminated" and was subsumed within the new position of Director of Safety.  Prior to her termination, however, Ms. Kullen requested to be considered for the position of Director of Safety, and the human resources department informed her that she was qualified.  Nonetheless, she did not get any response to her application and the position went to a man.

***Defendants' Discriminatory Conduct towards Ms. Farrell and the Retaliatory Termination of her Employment.***

88.     Ms. Farrell was the next female executive that Quanta Services fired.

89.     Ms. Farrell was hired in September 2012 as Division Counsel for QPG, after being interviewed by John Weathington, legal counsel from Quanta Services, and all the QPG executive staff and then CEO of QPI, Laursen.  During her tenure, she reported directly to Mr. DonMoyer as well as to Quanta Services Legal group.

90.     Both Mr. DonMoyer and Laursen were very happy with Ms. Farrell's job performance, business development, and work hours.  Indeed, Laursen stated that Ms. Farrell *was one of the top EPC attorneys he had ever worked with.*

91.     Ms. Farrell was subjected to a sexual overtures from McCann, and when she failed to respond to these overtures, McCann made petty and unsubstantiated accusations against her, and exhibited anger and hostility towards her.  For example, when Ms. Farrell included a glass of wine on an expense statement for a business trip, McCann accused her of drinking on the job and withheld payment of all of her expenses.  For another example, on the only occasion when Ms. Farrell played golf on a Friday with one of Quanta's clients, Laursen and a vendor, at a client development event, McCann falsely accused her of regularly absenting herself from work on Fridays for golf.  For yet another example, when Ms. Farrell attended an energy seminar given by one of Quanta's clients, which had been approved by her supervisor, McCann falsely accused her of not being at her desk and making this a regular and wasteful work practice.

92.     Ms. Farrell witnessed acts of harassment and demeaning behavior by McCann against other female employees at Quanta Services and its Subsidiaries.  For example, she was made aware that McCann repeatedly requested that a female subordinate come down to his hotel room to "*eat a banana split*" during a business conference in Hawaii in May 2013.

93.     Ms. Farrell witnessed Defendants' gender discrimination against the other Plaintiffs in this lawsuit, including the continuing harassment of female employees and Defendants' selective termination of Plaintiffs' employment based on their gender and without cause, without progressive discipline, and without conferring with her or with Mr. DonMoyer.

94.     Ms. Farrell determined that Defendants' treatment of women was illegal, and she communicated her objection to Spagnola (QPG Chief Financial Officer) on a number of occasions beginning in mid-2013.

95.     Receiving inadequate responses from Spagnola, Ms. Farrell took her concerns about gender discrimination to the General Counsel of Quanta Services, Gerard Sonnier.  She emailed him and requested a private meeting at a then upcoming controller's conference in Houston in September 2013.

96.     Sonnier made it clear that he did not intend to speak privately with Ms. Farrell at the conference, so Ms. Farrell reported the harassment and wrongful terminations to other attorneys in the legal department, including Quanta Services in-house investigative counsel, Maria Thukral.

97.     A week before her termination, Sonnier, Spagnola, and McCann had a private meeting to discuss.  Mr. DonMoyer was not permitted to attend the meeting, despite his being her direct supervisor and his request to be included.

98.     On September 26, 2013, one week after Ms. Farrell reported the discrimination to Quanta Services' home office, Quanta Services terminated her employment with no advance indication that she had failed to perform as expected.  Quanta Services merely told her "*executive leadership was going in a different direction*."

99.     Quanta Services replaced Ms. Farrell with three male attorneys.

***Defendants' Discriminatory Conduct Toward and Retaliation Against Mr. DonMoyer in its Failure to Promote him and the Subsequent Termination of his Employment.***

100.     As set forth above, Mr. DonMoyer was successfully leading QPG and had taken action in response to Ms. Cole's reports of gender discrimination when Quanta Services brought in McCann.  Specifically, Mr. DonMoyer had, as explained in preceding paragraphs, resisted discriminatory acts and practices exhibited by Dzeima and Cowart and those reporting to them by formally counseling them, and later by removing them from their positions of authority.

20

Dzeima's and Cowart's discontent with Mr. DonMoyer's response was communicated to senior executives at Quanta Services.  Mr. DonMoyer was at one point instructed by persons acting on behalf of Quanta Services to ignore their conduct, and he refused.  Thereafter, Quanta Services placed McCann in position as CEO of QPI to replace Laursen, and McCann explained upon his arrival that he was put there by Quanta Services to rectify problems associated with Mr. DonMoyer's hiring and support of female senior executives.

101.    Compared to Mr. DonMoyer, McCann had very little experience marketing, bidding, designing, and constructing utility scale energy generation projects and had spent most of his career in the telecommunication industry.  In contrast, Mr. DonMoyer not only had more such experience, he also had demonstrated competence and success in his three years at QPG. Further, Mr. DonMoyer had been told by Trawick that McCann had previously been terminated for cause, based on performance issues related to dishonesty and alcoholism, from a Quanta Services subsidiary by Quanta Services' senior management, Trawick and O'Neil.  Then, in 2015, after the events described in this lawsuit, Quanta Services again terminated McCann after the decline of the business built by Mr. DonMoyer and Laursen.  Allegedly, Laursen was thereafter brought back in as a consultant.

102.    McCann terminated the employment of Ms. Cole, Ms. Kullen and Ms. Baynard over a period of several months—without conferral with Mr. DonMoyer.  Mr. DonMoyer expressed increasing opposition to Defendants' terminations of Plaintiffs' employment to McCann, as well as to Vivek Arora, Quanta Services Director of Human Resources and Labor Counsel, and Wisenbaker, Quanta Services Executive VP of Operations.  Arora and Wisenbaker

told Mr. DonMoyer to proceed with McCann's directions and that Quanta Services would deal with any issues or repercussions.

103.     The same day Quanta Services terminated Ms. Farrell's employment, it terminated Mr. DonMoyer's employment.

104.     As set forth above in Paragraphs 58-59, McCann expressed to Mr. DonMoyer that he and high level executives of Defendants considered Mr. DonMoyer to be linked to, or a cause of, the "problem" with having high level women executives.

105.     Because of Mr. DonMoyer's association with the Plaintiffs and because Mr. DonMoyer disciplined male employees who engaged in gender discrimination and further objected to the discriminatory terminations of the  Plaintiffs' employment, Defendants broke their promise to promote Mr. DonMoyer to CEO when Laursen retired and then terminated Mr. DonMoyer's employment on September 26, 2013.

***Defendants' Discrimination and Retaliatory Termination of the Last Female Executive, Ms. Giacomozzi.***

106.     Ms. Giacomozzi's termination, on July 23, 2014, marked the termination of the last female senior executive and Defendants' successful effort to rid the workforce of women.

107.     Ms. Giacomozzi was hired by Laursen and Mr. DonMoyer in December of 2010 as Director of Project Controls & Financial Services for QPG.  Laursen asked her to prepare weekly and monthly financial reports and relied upon her expertise in both operations and financial reporting.  Laursen also asked her to participate in the weekly executive calls with other Quanta Services subsidiaries because financial information, budgets, forecasting, and business planning was routinely discussed.   Ms. Giacomozzi had daily communications with both

Laursen and Mr. DonMoyer which is in stark contrast to her limited interaction with McCann and Ed Will, acting QPG President after Mr. DonMoyer was terminated.

108.    Mr. DonMoyer evaluated Ms. Giacomozzi as exceeding or greatly exceeding all job performance expectations in her written performance evaluation.

109.    When McCann replaced Laursen in March 2013, he treated Ms. Giacomozzi differently than how he treated other male executives at her level.

110.    For instance, as opposed to her male peers, McCann rarely met with Ms. Giacomozzi or called her.  He rarely asked for her opinions or input, communicated his expectations, or provided feedback about her performance.

111.    In August of 2013, Ms. Giacomozzi learned that, without her knowledge or desire, McCann had demoted her to VP of Project Development & Commercial Services.  She had no experience in business development and did not want the change.  She expressed this concern to Mr. DonMoyer, and he indicated that he argued with McCann about the reassignment, but that McCann would not change the decision.

112.    McCann informed third parties that his demotion of Ms. Giacomozzi was actually a "promotion," despite the facts that she did not receive an increase in pay, two departments were removed from her responsibility, and her authority was reduced.  McCann commented publicly on several occasions words to the effect that "*People think I have a problem with women, but look I promoted [Ms. Giacomozzi].*"

113.    When she learned of her position change, Ms. Giacomozzi asked Mr. DonMoyer for guidance in her new role, and Mr. DonMoyer agreed to accompany her on customer calls and

train her in the new position.  Three weeks later, however, McCann fired Mr. DonMoyer, as set forth in Paragraph 105 above.

114.    Ms. Giacomozzi requested that McCann and Will provide guidance in her new role, but neither did.  In fact, shortly after her new assignment, Will began to give direction directly to her subordinates, undermining Ms. Giacomozzi's authority.

115.    Ms. Giacomozzi requested a meeting with Will on January 10, 2014 to discuss the performance of all of her direct reports, and the need for a performance improvement plan for one of her male reports.  Will told her to "*stand down*" with regard to disciplining the male employee.  Five days later, on January 15, her only female direct report was fired without Ms. Giacomozzi's knowledge or input.  The next day, January 16, a new organization chart was announced showing that two departments had been removed from Ms. Giacomozzi's authority and assigned to her male counterpart, Flaherty.

116.    In mid-January 2014, Ms. Giacomozzi received the first half of her 2013 annual bonus, which was significantly less than the previous year.  Ms. Giacomozzi was the only woman on QPG's Executive Team and, upon information and belief, she received the lowest 2013 bonus.  Ms. Giacomozzi was told that Spagnola (QPG Chief Financial Officer) told at least one male employee not to disclose the value of his bonus, "particularly to Diane [Giacomozzi]."

117.    In May of 2014, Ms. Giacomozzi attended a business meeting in which Flaherty expressed the opinion of Defendants' male executives, namely: *"When are you going to understand it's a man's world?"* Ms. Giacomozzi reported the discriminatory comment to Debbie Hanley, QPG human resources manager.

118.    Then, in June 2014, one of Ms. Giacomozzi's team members reported to her that McCann had made inappropriate comments in business meetings.  She reported those events, as well as Flaherty's discriminatory comment, to Jeff Becker, Divisional Counsel, the week of June 16, 2014.  Becker indicated he would investigate the allegations.

119.    In a follow-up meeting with Becker, Ms. Giacomozzi also reported the discriminatory treatment by McCann and that she believed that she was being treated differently than the male executives.

120.    The following day, July 1, 2014, Ms. Giacomozzi was called into a meeting with Becker and Will who accused her of questioning the company's "solvency" in a previous meeting.  She was then told that Will had to personally accompany her at any future meetings with customers.

121.    The next day, July 2, 2014, Ms. Giacomozzi reported to Hanley that she believed that Becker and Will were retaliating against her for complaining about gender discrimination. Hanley told her to speak with Thukral.  That day, Ms. Giacomozzi left Thukral a voice message asking to speak to her.

122.    On Tuesday, July 8, 2014, Ms. Giacomozzi received an email from McCann unfairly berating her work performance.  McCann included a large group of other employees on the email.

123.    On July 9, 2014, Ms. Giacomozzi spoke with Thukral and Hanley and again verbally reported the gender discrimination and retaliation.

124.    On July 23, 2014, Ms. Giacomozzi was fired during a meeting that included McCann and Thukral via phone, and Will, Becker, and Nobles.  McCann started the meeting by

discussing his July 8 email and then stated words to the effect that they decided to "go a different direction," and turned the meeting over to Will and he got off the phone.  At that time, Will told Ms. Giacomozzi that she was being fired.

125.    Quanta Services filled her position with a male.

***Additional Retaliation by Defendants and Their Attempts to Intimidate Plaintiffs.***

126.    On December 11, 2013, Ms. Cole filed a charge of discrimination and retaliation against Defendants with the EEOC.  On January 15, 2014, Ms. Farrell and Mr. DonMoyer filed charges of discrimination and retaliation against Defendants with the EEOC.  Then, on February 11, 2014, Ms. Baynard and Ms. Kullen filed charges of discrimination and retaliation against Defendants.   Ms. Giacomozzi filed a charge of discrimination and retaliation against Defendants on August 28, 2014.

127.    On February 24, 2014, *over 8 months after Ms. Cole was terminated*, the Defendants asserted for the first time that Ms. Cole had "held herself out as an attorney" during her employment, "mislead" Quanta executives into believing that she was an experienced and qualified attorney, and that she "rendered legal advice" that was protected from discovery by the attorney-client privilege.

128.    In a subsequent letter in March 2014, Quanta again asserted to Ms. Cole's legal counsel that Ms. Cole had engaged in the unauthorized practice of law and demanded that she return any copy of the Executive Summary (described above in Paragraph 53) that she had in her possession, claiming it was subject to attorney-client privilege.  In that letter, and those that followed, Defendants threatened to take "appropriate action" if Ms. Cole did not return the Executive Summary.

129.     Not once during Ms. Cole's employment had anyone at Quanta Services or its Subsidiaries QPG and QPI alleged that she had presented herself as an attorney or suggested that she was acting beyond her scope as Director of Human Resources.

130.     On March 21, 2014, Ms. Cole filed a charge of retaliation against Quanta at the EEOC for retaliation for complaints while employed and for filing her original EEOC charge.

131.     On March 28, 2014, Defendants filed a complaint against Ms. Cole at the Colorado Supreme Court Attorney Regulation Counsel alleging that Ms. Cole engaged in the unauthorized practice of law while employed at Quanta.  Defendants did not provide any actual evidence of this allegation.

132.     Upon information and belief, the filing of this complaint and the threats to take "action" against Ms. Cole was both retaliatory and meant to intimidate Ms. Cole and the other Plaintiffs from asserting and pursuing their legal rights.

133.     Ms. Cole requested that Defendants provide certain evidence to the Colorado Supreme Attorney Regulation Counsel that would show she did not engage in the unauthorized practice of law.

134.     Defendants refused to provide the requested information to the investigator at the Attorney Regulation Counsel and invoked the "attorney-client" privilege with other in-house counsel at Quanta Services as a basis for refusing to provide evidence of its allegations.

135.     On September 4, 2014, the Attorney Regulation Counsel dismissed the complaint against Ms. Cole, concluding that there was no evidence of misconduct and because Quanta had invoked the attorney-client privilege in refusing to provide the requested information.

136.     On October 2, 2014, Ms. Cole filed her second charge of retaliation at the EEOC based on Quanta's filing of the complaint at the Colorado Supreme Court Office of Attorney Regulation Counsel.

137.     Defendants and their legal counsel employed similar retaliatory and intimidating tactics against Mr. DonMoyer and Ms. Farrell.

138.     For example, in letters written on Defendants' behalf by their legal counsel on February 24, 2014, and March 4, 2014, Defendants warned Mr. DonMoyer and Ms. Farrell against providing information to the EEOC in connection with the Plaintiffs' individual charges with the EEOC.  Defendants vaguely asserted that Mr. DonMoyer and Ms. Farrell would be in breach of confidentiality and other agreements if they shared information with the EEOC and the other Plaintiffs, and further threatened Ms. Farrell that she placed herself "in peril" if she revealed communications between herself and Defendants on legal matters.

139.     Defendants also threatened Ms. Farrell with a claim of professional malpractice, asserting to the EEOC in March 2014 that Ms. Farrell had committed errors during her tenure at Quanta Services that purportedly constituted "actionable malpractice."  This was the first time Defendants had ever made such an assertion, and the allegation lacked a reasonable basis in law and in fact.

**V.**
**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**GENDER DISCRIMINATION IN VIOLATION OF TITLE VII**
*By All Plaintiffs against All Defendants*

140.     Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

141.    Defendants are joint employers as they share or co-determine matters governing the essential terms and conditions of employment, including title and job responsibilities, compensation, and matters of hiring and firing.

142.    Alternatively, Defendants operate as an integrated enterprise as they maintain interrelations of operation, common management, centralized control of labor relations, and common ownership and financial control.

143.    Alternatively, notwithstanding theories of joint liability between Quanta Services, QPI, and QPG, Quanta Services was and is the alter ego of these Subsidiaries, and managed their affairs in such a way that to separate their identities in this case would result in injustice.

144.    Defendants' executives participated in and/or condoned the unlawful employment practices described above, thereby discriminating against Plaintiffs Cole, Baynard, Farrell, Giacomozzi and Kullen with respect to the terms and conditions of their employment based on their gender.

145.    Defendants' executives participated in and/or condoned the unlawful employment practices described above, thereby discriminating against Plaintiff DonMoyer with respect to the terms and conditions of his employment because of his association with the women Plaintiffs.

146.    The unlawful employment practices include, without limitation, disparate treatment, failure to promote, demotion, and termination of employment because Plaintiffs are women or, in the case of Mr. DonMoyer, Defendants perceived a close professional and manager/subordinate relationship between Mr. DonMoyer and these women.

147.    As set forth above, Defendants' executives participated in and/or condoned gender-related mistreatment of Plaintiffs that was sufficiently severe and pervasive as to create a

hostile work environment.  The mistreatment included, without limit, sexist and hostile remarks directed at Plaintiffs, obstruction of Plaintiffs' job performances, and interference with the terms and condition of their employment, including compensation and advancement.

148.     Defendants' managers, supervisors, and executives were aware of, and indeed intentionally participated in, the discriminatory misconduct.

149.     Defendants' unlawful employment practices were intentional.

150.     Defendants committed the unlawful employment practices with malice or with reckless indifference to Plaintiffs' federally protected rights.

151.     The effect of these practices deprived Plaintiffs of equal employment opportunities and otherwise adversely affected Plaintiffs' employment status because of their gender as women or association with women.

152.     As a proximate result of the Defendants' above-stated discriminatory actions, the Plaintiffs have suffered losses, including but not limited to loss of wages, loss of promotions, and emotional distress.

**SECOND CLAIM FOR RELIEF**

**RETALIATION FOR ENGAGING IN
PROTECTED ACTIVITY UNDER TITLE VII**
*By All Plaintiffs against All Defendants*

153.     Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

154.     Plaintiffs believed, in good faith, that Defendants were engaging in unlawful employment practices.

30

155.     Plaintiffs engaged in protected opposition to Defendants' unlawful employment practices during their employment by complaining to their supervisors, Defendants' human resources department, and/or Defendants' in-house labor counsel about the discrimination.

156.     In retaliation for Plaintiffs' opposition to what Plaintiffs reasonably believed to be Defendants' violations of the law, Defendants failed to promote and/or demoted Plaintiffs, and then ultimately terminated Plaintiffs' employment.

157.     Plaintiffs also engaged in protected opposition to Defendants' unlawful employment practices *after* they were unlawfully terminated by filing individual charges of discrimination against Defendants with the EEOC.

158.     Shortly after Ms. Cole filed her charge with the EEOC, Defendants threatened to file a baseless charge against her with the Attorney Regulation Counsel in retaliation for filing her EEOC charge.   After Ms. Cole filed her additional charge of retaliation at the EEOC, Defendants filed a charge at the Attorney Regulation Counsel in retaliation against Ms. Cole. Defendants thereafter refused to cooperate in the investigation by the Attorney Regulation Counsel and produce documents corroborating Ms. Cole's innocence.

159.     Within one month of Ms. Farrell filing her charge with the EEOC, Defendants baselessly accused Ms. Farrell of professional malpractice in a submission to the EEOC and implicitly threatened her with a lawsuit.

160.     Defendants' conduct, including the failure to promote and/or demotion, termination, and baseless accusations, was undertaken to retaliate against Plaintiffs and to dissuade each of them from supporting and prosecuting their respective legal claims against Defendants.

161.    Defendants' unlawful employment practices were done with malice or with reckless indifference to Plaintiffs' federally protected rights.

162.    As a proximate result of the Defendants' above-stated conduct, Plaintiffs have suffered losses, including but not limited to loss of wages, loss of promotions, and emotional distress.

## THIRD CLAIM FOR RELIEF

### TERMINATION IN VIOLATION OF PUBLIC POLICY
### *By Plaintiffs Baynard, Giacomozzi, DonMoyer and Farrell against All Defendants*

163.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

164.    The State of Colorado has acknowledged a public interest in the freedom from discrimination and/or harassment on the basis of a number of protected classes, including gender, and has done so through the passage of laws prohibiting such conduct. (C.R.S. Sections 24-34-401, *et seq*.) These laws were in effect at the time of Plaintiffs' terminations of employment.

165.    Defendants terminated Plaintiffs' employment because Plaintiffs objected to and resisted the discriminatory conduct described in this Complaint—i.e., gender based termination and harassment—as it is prohibited under Colorado Law.  Plaintiffs' objections and resistance were offered in the good faith belief that Defendants were engaged in discriminatory conduct in the form of gender-based discrimination and harassment.  But for their resistance to Defendants' discriminatory conduct, the termination of Plaintiffs' employment would not have occurred.

166.    Defendants' conduct was willful and wanton and attended by circumstances of malice and a reckless disregard for Plaintiffs' rights.

167.    As a direct result of Defendants' actions, Plaintiffs have suffered significant damages, injuries, and losses.

### FOURTH CLAIM FOR RELIEF

### ABUSE OF PROCESS
### *By All Plaintiffs against All Defendants*

168.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

169.    Upon information and belief, Defendants filed a complaint with the Attorney Regulation Counsel for the ulterior purposes of (a) intimidating Ms. Cole and the other Plaintiffs from proceeding with their charges of discrimination with the EEOC, (b) intimidating Ms. Cole and the other Plaintiffs from filing a complaint with this Court upon receiving a right to sue from the EEOC, and (c) attempting to prevent Ms. Cole from possessing evidence in the form of the Executive Summary to support her legal claims.

170.    Defendants' conduct was a willful and improper use of the Attorney Regulation Counsel, an adjunct of the Colorado Supreme Court.  After filing their complaint with the Attorney Regulation Counsel, Defendants refused to cooperate in that investigation and withheld information and documents that would have corroborated Ms. Cole's innocence.

171.    Defendants lacked a reasonable factual and legal basis to support their accusation that Ms. Cole actively represented herself to Defendants as a licensed attorney.

172.    Plaintiffs suffered actual damages, including but not limited to attorneys fees and costs, and consequential damages, including but not limited to emotional distress and reputational harm.

## FIFTH CLAIM FOR RELIEF

### MALICIOUS PROSECUTION
### *By Cindy Cole against All Defendants*

173.    Plaintiff Cole incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

174.    Defendants filed a complaint against Ms. Cole with the Colorado Supreme Court's Attorney Regulation Counsel.

175.    Defendants' complaint ended in favor of Ms. Cole.

176.    Defendants' complaint against Ms. Cole lacked probable cause as Defendants did not have a reasonable factual and legal basis to support their complaint.

177.    In bringing their complaint against Ms. Cole, Defendants acted maliciously, with a knowing or reckless disregard for the truth.

178.    As a result of Defendants' conduct, Ms. Cole suffered actual damages, including but not limited to attorneys fees and costs, and consequential damages, including but not limited to emotional distress and reputational harm.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants jointly and severally, and award the following relief, to the fullest extent allowed by law:

a.    Back pay and related compensation, and front pay, in amounts to be determined at trial;

b.    Compensatory and consequential damages, as allowed;

c.    Emotional distress damages, as allowed;

d.      Punitive damages, as allowed;

e.      Injunctive and/or declaratory relief;

f.      Pre-judgment and post-judgment interest at the highest lawful rate and adjustment

for tax consequences;

g.      Attorneys' fees and costs of this action, including expert witness fees, as

appropriate; and

h.      Any such further relief as justice allows.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of September, 2015.


*s/ Paula Greisen*
_____
Paula Greisen
Meredith A. Munro
KING & GREISEN, LLP
1670 York Street
Denver, Colorado 80206
(303) 298-9878 telephone
(303) 298-9879 facsimile
greisen@kinggreisen.com
munro@kinggreisen.com


*s/ Peter G. Friesen*
_____
Peter G. Friesen
LEVIN ROSENBERG, PC
1512 Larimer Street, Suite 650
Denver, Colorado 80202
(303) 575-9390 telephone
(303) 575-9385 facsimile
peterfriesen56@gmail.com

*Attorneys for Plaintiffs*

Plaintiff's Mailing Addresses:

Cindy Cole
721 Kenosha Drive
Larkspur, CO  80118

Patsy Baynard
7246 Briza Loop
San Ramon, CA  94582-5070

Marta Farrell
2104 Taylor Pond Lane
Bedford, MA  01730

Diane Giacomozzi
697 Fairchild Drive
Highlands Ranch, CO  80126

Kimberly Kullen
3780 Kayewood Drive
Little Elm, TX  75608

Michael DonMoyer
P.O. Box 637
Tabernash, CO  80478