## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01992-RPM

MICHAEL DONMOYER,

      Plaintiffs,

v.

QUANTA SERVICES, INC. and QUANTA POWER GENERATION INC. and its related entities, including QUANTA POWER, INC.,

      Defendants.

_____

## PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT
_____

Plaintiff, Michael DonMoyer ("Mr. DonMoyer"), through his attorneys, Peter G. Friesen of LEVIN SITCOFF PC, hereby responds to Defendants Motion for Partial Summary Judgment. [Doc. 88]

## I.      INTRODUCTION

Defendants' Motion essentially pursues two objectives. First, the Motion asks the Court to reconsider its ruling on Plaintiff's claim of associational discrimination pled in his first claim of relief (denied by the Court earlier this year [Doc. 61]). Second, the Motion seeks dismissal of Plaintiff's claim that he was wrongfully denied promotion to CEO as a consequence of his opposition to gender based discrimination (retaliation). The motion does not seek the dismissal of DonMoyer's alleged failure to promote based on associational discrimination, except insofar as it seeks the Court's reconsideration of associational discrimination as the proper basis for a claim.

In their Motion, Defendants failed to acknowledge strong direct evidence of retaliatory intent expressed by Quanta Services ("Quanta") employees acting in the course and scope of their employment. This intent was first communicated ambiguously to DonMoyer by Quanta's appointed agent, Ken Trawick ("Trawick"), and then unambiguously by John McCann ("McCann") to both Plaintiff and retiring CEO Chris Laursen ("Laursen"). These corporate admissions notwithstanding, there is also substantial circumstantial evidence necessitating submission of all of Plaintiff's claims to a trier of fact. In discussing the admissibility of evidence of McCann's statements, it is necessary to discuss at some length his employment relationship with Quanta, as well as the relationship between Quanta and Quanta Power, Inc. (QPI). Quanta has not yet admitted that McCann had an employment relationship with Quanta. Quanta's refusal to make this admission is problematic, given that it has already agreed not to contest that Plaintiff was jointly employed by both QPG and Quanta Services. Since McCann's statements as Quanta's employee dominate the landscape of this case, it is difficult to explain why these statements, as well as the issues surrounding them, were not addressed in Defendants Motion.[1]

## II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff disputes the allegation that Duke Austin ("Austin") was the sole decision maker on that matter, and that his decision was based his disagreement with the cost structure of QPG. (Doc. 88 at pp 4-5) As detailed below, the decision was based on DonMoyer's position on a controversy between male construction workers and DonMoyer's female executive subordinates. There is substantial evidence of Austin's knowledge of this controversy and of the role this knowledge played in the selection of McCann.  (See particularly PSAF ¶¶ 10, 12. 14, 15, 17, 18, 20-25) While Quanta mentions the termination of men after McCann's arrival, it has not set forth

---

[1] Plaintiff has made significant efforts to anticipate Quanta's position with regard to McCann's statements, but nonetheless respectfully requests an opportunity to respond to Quanta's reply on these issues.

a rationale for why that fact effectively negates evidence submitted here, and the allegations in Plaintiff's complaint.

### III.    PLAINTIFF'S STATEMENT OF ADDITIONAL DISPUTED FACTS

1.      Quanta Services ("Quanta") is a conglomerate that conducts business through wholly owned subsidiaries. In 2010 Quanta engaged Chris Laursen and Michael DonMoyer to build a full service engineering/procurement/construction ("EPC") company focused on the coordinated marketing, bidding, engineering, procurement, and construction of renewable energy generation projects. The company was first incorporated as Quanta Renewable Energy Services, Inc. ("QRES"). (Decl. DonMoyer at ¶ 2.)

2.      From July 2010 through September 2013, DonMoyer was employed by Quanta Services, Inc. and tasked to work with Laursen to build an EPC organization that could generate $50 to $100 million in operating income. In the process of building this business, he played the primary role (along with Laursen) in the hiring of a number of highly qualified and experienced female executives, including Cindy Cole, Patsy Baynard, Kimberly Kullen, Diane Giacomozzi, and Marta Farrell. These women assisted Laursen and DonMoyer in the implementation of an EPC business model within companies reporting to Quanta Services. After its first full year of operation, Laursen and DonMoyer reorganized QRES into Quanta Power Generation, Inc. ("QPG") which reported along with several other companies to Quanta Power, Inc. ("QPI"), collectively QPG/QPI. DonMoyer was appointed by Quanta as President of QPG and Laursen was appointed by Quanta as CEO of QPI. Other wholly owned Quanta subsidiaries reported to QPI, served QPI's business model, and were subject to Laursen's direction as QPI CEO, namely Ryan Construction, Intermountain Electric, and Manuel Brothers. Laursen's authority to exercise this direction flowed from his selection as CEO by Quanta. As outlined below, Laursen and DonMoyer's respective

positions as President-QPG and CEO-QPI were, as a matter of corporate structure, similar in that they reported and were accountable to Quanta Services in all significant facets of their business. While Laursen presided over a different corporate entity, DonMoyer reported to him. (Decl. DonMoyer at ¶¶ 2,3.)

 3. While QPG/QPI were formed as separate corporate entities from Quanta, the separation between them had no substance, and they should be regarded as a single employer for purposes of this litigation. Quanta exercised direct and pervasive management and control over these entities and treated these entities—along with their employees—as Quanta's agents. Statements by management of these entities are therefore statements by Quanta. Quanta has admitted a number of the allegations supporting the merging of Quanta, QPG, and QPI in its Answer to Plaintiff's Supplemental Complaint (Doc. 25).

- QPG and QPI were wholly-owned subsidiaries of Quanta. (Decl. DonMoyer at ¶ 4; Doc. 25 at ¶ 23.)

- There was no formal or informal reporting relationship to a board of directors, i.e., Laursen and DonMoyer did not engage with, report to, or otherwise communicate in any significant way with QPG or QPI's Boards. (Decl. DonMoyer at ¶ 4.)

- Those Boards consisted entirely of Quanta employees. (Decl. DonMoyer at ¶ 4; Doc. 25 at ¶ 24.)

- The QPG-President and QPI-CEO roles were filled by decision-makers at Quanta (Quanta's COO and CEO), and they reported directly (as a matter of contract) to a Quanta corporate agent. Quanta often ordered the lateral transfer of employees between operating units. (Decl. DonMoyer at ¶ 4; Doc. 25 at ¶¶ 25, 35.)

- The QPG-President and QPI-CEO were regarded as joint employees of the local corporate entities and Quanta. (Decl. DonMoyer at ¶ 4;  Exh. 1, Quanta's Resp. to Pl.'s Request for Admission no. 10, at 4--As to QPG President "Defendants do not contest" this allegation.)

- Performance expectations for the QPG-President and QPI-CEO were subject to review and approval by Quanta. As chief executives, they functioned under performance incentive contracts made directly with, and paid by, Quanta. Bonus allocations to other senior employees of QPG and QPI were subject to Quanta approval. (Decl. DonMoyer at ¶ 4; Doc. 25 at ¶¶  25, 26, 27.)

- The QPG-President and QPI-CEO were subject to removal by Quanta without QPI or QPG Board authorization. (Decl. DonMoyer at ¶ 4.)

- The QPG/QPI organizations were subject to control by a centralized human resources office managed under the direction of Quanta's Human Resources department. (Decl. DonMoyer at ¶ 4; Exh. 2, Austin Dep. 26:1-27:10,

- QPG/QPI interacted with and consulted with Quanta attorneys. Quanta provided legal counsel on matters of contract negotiation and corporate litigation to QPG and QPI. Quanta directed and controlled all matters pertaining to litigation involving QPG and QPI. (Decl. DonMoyer at ¶ 4.)

- Quanta guaranteed performance on contracts that QPG/QPI entered and engaged in a review and approval process for all significant QPG/QPI contractual commitments. (Decl. DonMoyer at ¶ 4; Doc. 25 at ¶ 33.)

- Quanta provided authorization for the coordination and contracting of working relationships and agreements among its subsidiaries, including QPG and QPI, and

it regularly intervened in the event of conflicts or disputes between subsidiaries. (Decl. DonMoyer at ¶ 4.)

- Quanta took all the profits from QPG/QPI and transferred them to Quanta shareholders, except for funds necessary to pay QPG/QPI's general and administrative costs.  (Decl. DonMoyer at ¶ 4; Doc. 25 at ¶ 32.)

- All three entities are presently represented by Quanta counsel.

4.      Laursen and DonMoyer's executive performance goals included an ambitious program to reach $50 million in net annual profit within five years. Laursen and DonMoyer's performance was consistent with that growth objective; they achieved roughly $8 million in annual profits in their first six months in 2010, $23 million in 2011, and $33 million in 2012. These numbers exceeded Quanta's expectations by over 100 percent. Quanta paid incentive compensation consistent with their productivity. (Decl. DonMoyer at ¶ 5.)

5.      QPI and QPG were obligated by Quanta to submit a succession plan for key executives. Laursen was expected to retire in the third year of operation. In accordance with Quanta's mandate, QPI submitted a succession plan each year identifying DonMoyer as successor to Laursen. Quanta never communicated concern or reservation with DonMoyer succeeding Laursen until John McCann was appointed CEO of QPI in 2013. (Decl. DonMoyer at ¶ 6.)

6.      The classic EPC business model requires centralized controls over project bidding, engineering, procurement, and construction. Thus, DonMoyer and Laursen hired key executive employees to exercise audit and control functions that affected the autonomy of construction services companies brought within QPI supervision. These functions were regarded as vital to the EPC model and included centralized Project Management, Human Resources, Project Costs, Safety, and Legal controls. Each of these functions was filled by a woman who had significant

experience and capability in the discharge of her role. These were highly qualified and capable female executives. (Decl. DonMoyer at ¶ 7.) These women included Cindy Cole ("Cole") in Human Resources, Patsy Baynard ("Baynard") in Project Management, Kimberly Kullen ("Kullen") in Project Safety, Diane Giacomozzi ("Giacomozzi") in Project Controls, and Marta Farrell ("Farrell") in Legal.

7.     The construction sector of QPG/QPI expressed resentment and hostility over these controls, and male construction laborers expressed hostility toward female control personnel who reported to and were acting at the direction of DonMoyer. This involved periodic insults toward the gender of the women that reported to DonMoyer and Laursen. An example of such hostility includes announcements at a construction site in the first half of 2012, upon the arrival of QPI HR Director Cindy Cole: "Mike Hunt is at the gate." This was a play on words as there was no Mike Hunt employed there, and it was meant to refer to Ms. Cole as "Mike's C***." (Decl. DonMoyer at ¶ 8;

8.     DonMoyer was assigned the task of working through the hostility between the male construction personnel and the female executives in the new EPC organization that he and Laursen had built. DonMoyer addressed the problem by informing construction personnel that hostility toward the women reporting to him would not be tolerated and that they were obligated to work with these women and comply with their instructions. This did not sit well with construction management. One construction employee, Jeffrey Schmidt ("Schmidt"), left the company. Another, Jack Cowart ("Cowart"), bitterly resented his loss of autonomy to female executives and was ultimately removed from his role via transfer. A third, Dave Dzeima, refused to adjust and, after months of verbal counseling on the hostile environment toward women he and others

reporting to him had created, was fired for cause due in large part to his promotion of a hostile working environment toward women. (Decl. DonMoyer at ¶ 9.)

9.      Schmidt and Cowart had long standing friendships with Quanta CEO Jim O'Neil ("O'Neil") and COO Austin, to the extent that they were on a first name basis. On one occasion, in the spring of 2012, Cowart sent an email message to O'Neil headed "Dear Jim" and thereafter communicated his frustration with the controls that had been asserted over him by Laursen and DonMoyer. O'Neil responded to the communication, stated he would look into it, and followed up a year later, after Cowart's transfer, asking if he was "ok." (Decl. DonMoyer at ¶ 10; Exh. 4, Emails between Cowart and O'Neil.)

10.     In the fall of 2012, Quanta sector manager Ken Trawick - to whom Laursen reported directly and who reported directly to Quanta's COO and CEO - contacted Laursen and said that he would like to fly from Houston to Denver to have a private meeting with DonMoyer. Trawick was due to retire at the end of the year 2012. At the Denver meeting, Trawick explained to DonMoyer that the men in construction were communicating discontent to DonMoyer's superiors at home office— CEO O'Neil and COO Austin. DonMoyer was interested in who was making the complaints, but Trawick wouldn't say. Trawick referred to the evident tension ambiguously as a "clash of cultures" and said that DonMoyer needed to take measures that reduced the pressures on the men in DonMoyer's construction division. The ambiguity consisted of the fact that construction was having trouble adjusting to the kinds of centralized controls that the EPC business model requires but was expressing this difficulty through hostility toward the female executives who were asserting those controls.  During the conversation with Trawick, DonMoyer acknowledged the clash, but he clarified that much of it consisted of gender-based hostility directed by the men in construction towards the women who reported to him. They did not get into the specifics of those

issues, but DonMoyer made it clear to Trawick that a significant part of the men's problem was gender-based. He further stated he felt they were making progress in resolving the issues and that the transition would turn out well. (Decl. DonMoyer at ¶ 11.)

11.     On November 16, 2012, Cowart, who had participated in gender-based hostility, indicated that he was so frustrated with DonMoyer's organization that he could not continue in his role there.  (Exh. 5, Email from Cowart to Ernest Teague.) He had been communicating regularly with VP of QPG Construction, Earnest Teague, about his discontent until that time, and Teague had been relaying those concerns to Randall Wisenbaker ("Wisenbaker"), the Quanta sector manager who succeeded Trawick. On November 20th, Wisenbaker was directed by COO Austin to commence a search for a QPI CEO other than DonMoyer. Soon thereafter, he was instructed to stop the search as John McCann had been selected for the position and no other candidates would be considered. ( Exh. 6, Cowart Dep. at 167:18-169:13; Exh. 7, Wisenbaker Dep. at 24:23-29:9.)

12.     McCann's professional experience up to that point had been focused on the construction of telecommunications projects and included only nine months in a managerial role for a large energy project. He had once been employed by Quanta as CEO of a telecommunications construction company. His work at Quanta as CEO of Conti Communications did not include the direction of an EPC business model. Both DonMoyer and Laursen, who have many years of experience in the EPC energy generation industry, feel that McCann's resume did not qualify him to serve as director of an EPC company engaged in energy generation projects. (Decl. DonMoyer at ¶¶  1, 13;  Exh. 8, Laursen Dep. 163:5-167:9; Exh. 9, Trawick Dep. 21:21-22:8; Exh. 10, McCann's resume.) McCann was selected without verification that his prior employment at Bechtel involved any meaningful experience with EPC energy generation and without the consideration of any other candidates for the role. (Exh. 2, Austin Dep. 135:11-138:5.)

13      Austin acknowledged that the nickname used for McCann at the time of the decision to make him CEO, "honey badger", was an appropriate description of McCann and stated that the name referred to an "over-zealous" personality. (Exh. 2, Austin Dep. 93:24-96:7.) The "honey badger" is an animal in popular internet video that pursues a variety of prey and seems oblivious to resistance. (YouTube—at https://www.youtube.com/watch?v=4r7wHMg5Yjg).

14.     McCann was offered the job of QPI CEO in January 2013, but neither DonMoyer nor Laursen were notified until shortly before McCann's arrival in April 2013. When DonMoyer learned of McCann's appointment, he contacted Ken Trawick, who expressed surprise. Trawick told DonMoyer that McCann had been terminated as CEO of Conti Communications for cause, namely for alcoholism and dishonest financial reporting. After DonMoyer discussed this conversation with Laursen, Laursen repeated the allegations raised by Trawick to O'Neil. O'Neil did not deny the allegations and responded that everybody deserves a second chance. (Decl. DonMoyer at ¶ 14; Exh. 8, Laursen Dep.176:20-177:10.) [Offered as an adoptive admission under Rule 801(d)(2)(B).)] Austin has since verified that he was aware while selecting McCann that McCann was terminated for performance issues related to chronic alcoholism. Trawick has since verified that behavioral issues related to McCann's alcoholism included making threats of violence to customers. (Exh. 2,                       Exh. 9, Trawick Dep. 34:1-35:12.)

15.     On McCann's first day in Denver, he told DonMoyer that O'Neil and Duke Austin strongly disliked DonMoyer and had wanted to terminate his employment five months earlier. (This time frame roughly coincides with the time DonMoyer conversed privately with Trawick.) He further explained that O'Neil and Austin told him there were too many women in management for a construction company, that DonMoyer was responsible for that, and that he (McCann) had been appointed as CEO to correct that problem. (Decl. DonMoyer at ¶ 15.) In a private

conversation with Laursen on the same day, McCann stated: "Jim O'Neil thinks there's too many fucking women in the company, and I'm here to fix that." (Exh. 8, Laursen Dep. 167:14-21.)

16.   McCann's statements to DonMoyer and Laursen were made as Quanta's corporate agent and employee in the course and scope of his employment. These factors are to be considered in addition to evidence of the alter-ego relationship between Quanta and QPG/QPI.

- Quanta placed McCann in the CEO position for the purpose of making changes in the composition of QPI and QPG personnel. (Exh. 11, Quanta's Response to Plaintiff's Interrogatory no. 7; Exh. 2, Austin Dep. 139:2-140:10.)

- ████████████████████████████████████████████████ ████████████████████████████████████████████████ (Exh. 12, ██████████████████

- ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████. (Exh. 13, ████████████████████; Exh. 14, ████████ ████████████ at 1; Exh. 15, Arora Dep. 57:15-60:11.)

- McCann was subject to performance evaluation by Quanta, and could be terminated by Quanta. (Exh. 14, ████████████████████████, at 4; Decl. DonMoyer at ¶ 3; Exh. 15 Arora Dep. 60:20-61:12; [Exh. 7 Wisenbaker Dep. 8:17-9:5—verifying Wisenbaker's employment by Quanta].)

- McCann's incentive compensation agreement was directly with and paid by Quanta. (Exh. 16, ████████████████████████████████.)

- During his term of employment as QPI CEO, McCann never reported to or conversed with members of QPI's board of directors, and, in his deposition, he was

unsure whether QPI had a board of directors. (Exh. 17, McCann Dep. 334:16-336:24.)

- McCann's position as CEO of QPI was comparable to DonMoyer's position as President of QPG, and Quanta has agreed not to contest that DonMoyer was jointly employed by Quanta and QPG. (Decl. DonMoyer at ¶¶ 3,4; Exh. 1, Quanta's response to Plaintiff's request for Admission no. 10.)

17.     From the time he assumed the role of QPI-CEO in mid-April 2013, McCann acted as someone who had a pre-assigned task of ridding DonMoyer's organization of unwelcome female control employees. Despite DonMoyer's repeated recommendation that McCann meet with the senior female executives so he could understand and evaluate their roles, McCann refused to do so. McCann then terminated the employment of QPI HR Director Cole - the woman to whom the "Mike Hunt" comments were directed - without notice and without conferral with DonMoyer or Laursen.  He then ordered the termination of the Director of Project Management Baynard, also without any prior consultation with DonMoyer and without ever having met with or discussed her role or her performance at that role with her. Next, McCann terminated Director of Safety Kullen, allegedly pursuant to a reduction in force, without DonMoyer's prior consultation and over DonMoyer's express objection. He then removed Giacomozzi from her role as cost controller (which involved strong controls over the men in construction) and placed her in the role of director of business development, a position for which she had no experience and which she did not want. Regardless, McCann terminated her from that role nine months later. He also terminated QPG's in-house counsel Farrell and, on the same day, terminated DonMoyer. Farrell had joined DonMoyer in opposing the terminations of Cole, Baynard and Kullen. All of these female

executives had excellent performance records, and there was no reason to terminate their employment. (Decl. DonMoyer at ¶ 16.)

18.     All of these women—Cole, Baynard, Kullen, Giacomozzi, and Farrell—were key executives at QPG and QPI. DonMoyer was significantly involved in their hiring, training, mentoring, task assignments, and evaluations. All reported to both DonMoyer and Laursen and were regarded as crucial to the EPC organization that DonMoyer and Laursen had built. DonMoyer's success and compensation as President was dependent on these women's effective discharge of their duties. In the course of their work together, DonMoyer had developed friendships with them. Quanta COO Austin and CEO O'Neil knew that DonMoyer, along with Laursen, had built the organization and therefore had hired, trained, mentored, assigned tasks to, and evaluated these women and depended on them for the successful performance of the company (which translated into DonMoyer's incentive compensation). (Decl. DonMoyer at ¶ 17.)

19.     In January 2014, DonMoyer submitted a formal complaint to the EEOC alleging wrongful failure to promote and wrongful termination in violation of Title VII. In his complaint, he stated that he had been identified as Laursen's successor, that he had opposed discriminatory practices before McCann's selection as CEO, that McCann was chosen as CEO after having been terminated for cause from another Quanta subsidiary, that he and McCann were employees of Quanta, and that McCann announced that he had been sent by home office to take care of the problems created by the presence of too many women at QPG/QPI.  (Decl. DonMoyer at ¶18; Exh. 18, DonMoyer's charge of discrimination to the EEOC, at 3-4.)

20.     Quanta filed a joint response to DonMoyer and Farrell's separate EEOC complaints. In that response, Quanta made its first attempt to explain why it chose McCann instead of DonMoyer to serve as Laursen's successor. Quanta stated that it made the decision to expand the

business model of QPG/QPI from one that was limited to engineering and procurement to one that added construction, such that it would then become a full service engineering, procurement and construction (EPC) company. Quanta further stated that Laursen told Quanta decision makers that DonMoyer was not ready to perform the CEO role because he lacked specific experience. (Exh. 19, Quanta's response to DonMoyer's charge of discrimination, at 1, 4-5.) Since Quanta now identifies then-COO Austin as the decision maker in the refusal to promote DonMoyer, this proposed rationale can be attributable to Austin.

21.     This was pretext. From the beginning Quanta engaged Laursen and DonMoyer to build a full service EPC company. They did this successfully, more than a year before McCann was considered for the CEO position. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (Exh. 20, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇, at 1774.) Furthermore, DonMoyer had extensive experience in all aspects of the EPC business model, including the completed construction of many complex energy generation projects. McCann's construction experience, on the other hand, was limited to the telecommunications industry and did not involve directing an EPC business model. Laursen has since testified that he never communicated to Quanta that he felt DonMoyer was not ready to assume the CEO role and never believed that to be the case. (Decl. DonMoyer at ¶¶ 1, 13, 21; Exh. 8, Laursen Dep. 13:5-18:21, 32:22-34:4, 180:23-186:6, 185:5-24.)

22.     After making these false statements to the EEOC, Austin abruptly changed his reasoning for selecting McCann over DonMoyer. His new explanation was first set forth in Quanta's response to Plaintiff's Interrogatory no. 7.  It claims the market of available projects for bid (also called the "pipeline") was shrinking at the time of McCann's selection and that QPG needed to reduce its overhead costs to compete in the solar market. Quanta also claims that QPG's

staffing was designed for fossil fuel as well as solar projects and that fossil fuel projects have higher overhead costs. Thus, McCann was supposedly brought on to reduce (not to expand) the organization. (Exh. 11, Quanta's response to Plaintiff's Interrogatory no. 7.)

23.     This explanation is also pretext. The market for new solar projects was, at that time, expanding considerably. DonMoyer and Laursen reported this to Quanta in QPI's 2013 business plan, and CEO O'Neil acknowledged this expansion in a public statement to Quanta shareholders. (Exh. 21, Transcript of O'Neil's teleconference October 2012, at 4544) This increase was also noted in a widely-accepted industry report on the annual progress of the utility scale solar generation market, which has increased by 600 percent between 2012 through 2016. In this time, QPG/QPI's comparably situated utility scale solar EPC competitors (Signal, Rosendin, and Swinerton) have on average increased their volume of business by over 1000 percent (Decl. DonMoyer at ¶¶ 1, 23; Exh. 22, SEIA 2016 Year in Review, at p.2; Exh. 23, Solar Power World productivity rankings 2013 and 2017 (each referring to prior year's volume).)

24.     At the time Quanta claims that QPG needed to reduce overhead, QPG had overhead of 3.6 percent, which was low even for solar companies. The other companies reporting to QPI - Ryan, Manuel Brothers and Intermountain Electric - were all registering overhead between five and ten percent, and there was no mandate (or subsequent effort), while DonMoyer reported to McCann, to make them leaner. Also at that same time, December 2012, Quanta approved the negotiation of a Denver lease for QPG reflecting a significant expected expansion of personnel due to the expected growth of the company. As of the date of Austin's deposition in January 2017, he could not say if, in fact, McCann made the organization leaner. (Decl. DonMoyer at ¶ 24; Exh. 2, Austin Dep. 139:2-140:15.)

25.     In the bidding of fossil-fuel projects, it is essential that the bidder show the customer that it has the organizational resources to execute on the bids.  Despite Quanta's claim that fossil fuel projects were the cause of excessive overhead expense and that Quanta's bidding on these projects was sluggish, Quanta did not stop bidding on non-solar projects and used the organization DonMoyer built as proof that QPG could execute on its bids. After McCann's arrival, QPG went on to complete successful bidding on $300 million in fossil fuel projects. (Decl. DonMoyer at ¶ 1, 25.)

## III.     DISCUSSION

### A.     Quanta has failed to provide a credible argument for reversal of the Court's earlier ruling that Plaintiff's associational discrimination claim is supported by the decision in *Thompson*.

Defendants' argument on this point remains essentially the same as in its 12(b)(6) motion. (Doc. 40) Quanta argues that there is no authority that explicitly bestows standing to sue on a man harmed by discriminatory conduct directed toward a woman. Plaintiff has previously argued that the failure to recognize associational claims, as a general proposition, left an unintended void in the law before the decision of *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011). Without *Thompson*, this void would allow an employer to target someone in a non-protected category for harm because of its interest in harming someone in a protected category. An individual might be singled out for harm simply because he might oppose discriminatory conduct, testify as a witness revealing discriminatory conduct, or otherwise exist as an impediment to discrimination, and not have a remedy. (Plaintiff's response to Defendant's Motion to Dismiss (Doc. 42).)

*Thompson* addressed this void by focusing on the language in Title VII, which affords redress to any person "aggrieved" by wrongdoing under the act—not just those who fall within one of the categories identified in Title VII. *Thompson*, 562 U.S. at 177. The Supreme Court

identified a range of actionable conduct. Harmful intent directed at a close family relationship would almost always support a third-party claim, but incidental or unintended harm to a bystander would almost never support a third-party claim. The Court then added that when evaluating third-party standing, courts should tend toward permissive rather than restrictive applications of its rule. *Id*. at 178-179.[2]

Defendants continue to treat *Thompson*—a Supreme Court decision—as though its precedential importance to this case is trivial and to rest their argument on cases that precede *Thompson*. Within their authorities that post-date *Thompson*, there is no reference to *Thompson,* or any attempt to apply *Thompson's* zone of interest standard. These cases involve situations where nothing more was alleged than co-employment and actions against a protected co-employee that were motivationally related to actions against an unprotected co-employee.

As in their 12(b)(6) motion, Defendants rely heavily on the unpublished case of *Salazar v. City of Commerce City,* No. 10-CV-01328-LTB-MJW, 2012 WL 1520124, at *6 (D. Colo. May 1, 2012), *aff'd*, 535 F. App'x 692 (10th Cir. 2013). As argued in Plaintiff's response to that motion, *Salazar* is not helpful in resolving Plaintiff's claim in this case. While making no mention of *Thompson* or of a zone of interest analysis, the opinion was careful to point out that *Salazar* had not made a *prima facie* case for either direct discrimination "or discrimination based on

---

[2] See Plaintiff's response to Defendants Motion to Dismiss (Doc. 42) at pp. 6-8 regarding the intended broad application of *Thompson* zone-of-interest analysis. *See also Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199, 2210 (2012) "The [zone of interest] standing test is not meant to be particularly demanding. We have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."; *Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Library of Congress, Inc. v. Billington,* 737 F.3d 767 (D.C. Cir. 2013) "[T]he zone of interests requirement poses a low bar."; *Florida Transp. Services, Inc. v. Miami–Dade County*, 703 F.3d 1230, 1256 (11th Cir.2012) recognizing that the "zone of interest" test "requires only that the relationship between the plaintiff's alleged interest and the purposes implicit in the substantive provision be more than marginal."; *Tolar v. Cummings* 2014 WL 3974671 (N. Dist. Ala. 2014) (not published), the zone of interest test generally incorporates a broad interpretation of standing, allowing plaintiffs to sue so long as they have an interest "arguably sought to be protected by the statutes."

association." *Id*. There is nothing in *Salazar* that indicates that it restricts the application of *Thompson* to cases of direct discrimination. *Salazar* suggests only that co-employment is insufficient in itself to make a case of associational discrimination.

Defendants' previously uncited authority, *Street v. Maverick Tube Corporation*, 2016 WL 8711338 (S.D. Texas June 17, 2016), suffers from similar deficiencies. In this unpublished *Memorandum and Recommendation* issued by a United States Magistrate Judge, the plaintiff vigorously opposed the racial harassment of a co-worker. However, the only relationship between the plaintiff and the victim of racial harassment was that of co-workers, which would likely be insufficient in itself to confer standing under the *Thompson* zone of interest test. In reading the decision, it is clear that neither *Thompson* nor the zone of interest test was considered. Furthermore, all of the authority considered in the evaluation of the associational claim preceded *Thompson*. The decision was never challenged, apparently because the plaintiff's relationship as co-worker, standing alone, did not support a plausible theory of intentional harm against him because of that relationship, and because the plaintiff was allowed to proceed with his retaliation claim.[3]

Defendants cite two new cases decided post-*Thompson*, but they are not applicable to the present matter because those plaintiffs' claims were not premised on associations with individuals who are protected under Title VII. The first of these cases is *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 349 (7th Cir. 2017), a case that has attained a fair measure of notoriety because it extended gender discrimination claims to gay women. In *Hively,* the court ruled that the plaintiff had a direct claim of gender discrimination because her employer's actions were motivated

---

[3] Defendants also ask the Court to look at *LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 693-94 (E.D. Pa. 2016), but this case fails to serve their argument in the same manner as *Salazar* and *Street*. The court did not cite to *Thompson* and did not apply a zone-of-interest analysis to its facts. All of the authorities cited in *LaRochelle* pre-date *Thompson*, and the facts of the case are limited to the allegation that the plaintiff's association was as co-worker, with no allegations supporting a plausible connection between action against protected employees and action against the plaintiff.

by a bias against her failure to conform to stereotypic expectations regarding who she should marry. The case had nothing to do with an associational claim because the plaintiff's spouse was not a co-employee and was not therefore asserting a third-party claim. The purpose of Title VII is to protect employees against discrimination. Since the spouse in *Hively* was not an employee of Ivy Tech, the case has no relevance to an associational claim.

The second of these cases is similarly deficient. Defendants cite to *Tovar v. Essentia Health,* 857 F.3d 771 (8th Cir. 2017). Brittany Tovar was an Essentia employee whose son had gender dysphoria and needed a sex-change operation along with sex-change medications. Her son was not an employee of Essentia, but he was a beneficiary under the insurance policy that Essentia provided to his mother. Ms. Tovar's gender discrimination claim against Essentia was not based on her association with a protected employee but on her association with an unprotected non-employee. Even though Title VII might have offered broad protection to Ms. Tovar if she had been subject to retaliation because of her son's insurance claim, she made no claim of retaliation. The opinion does not, therefore, restrict the application of *Thompson* to retaliation claims as Defendants suggest.

Defendants fallaciously insist that if a case has not explicitly permitted an associational discrimination claim based upon a specific type of association, then such a claim is prohibited. *Thompson* denounces this logic and mandates that such doubts resolve in favor of standing. [See footnote 1 above.] Notwithstanding the weak authority offered by Defendants in support of their request that the court reverse its earlier ruling, subsequent applications of *Thompson* are instructive on this point.

*Thompson* has been applied to the relationship between teachers and students protected under the Americans with Disabilities Act. *P.P. v. Compton Unified School Dist.*, 135 F.Supp.3d

1098 (C.D. Cal. 2015). [In that case, the teachers had standing under *Thompson* because the discrimination directly affected their interest in teaching, even though the students—not the teachers—were the protected class. *Thompson* has also been deemed to confer standing on an aggrieved employee who did not know the protected employee but whose termination was logically related to that of the protected employee.] *Castor v. Cash Exp. of Tennessee, LLC*,  77 F.Supp.3d 605 (W.D. Ky 2015). [While challenging the pretext for her termination, the protected employee in *Castor* identified another employee who had committed the same offense, which prompted the second employee's termination.] *Thompson* has been applied to union members who were subject to adverse treatment because of the protected speech of their union representative. *Behne v. Halstead,* 2014 WL 1689950 (M.D. Pa. April 29, 2014). [*Behne* held that separate and apart from their right of association, the plaintiffs' relationship as union members to an individual engaged in protected speech conferred standing under Thompson.] *Thompson* has been applied to aggrieved persons who were denied promotion because of their known loyalty to and support of their former boss. *Montone v. City of Jersey City*, 709 F.3d 181 (3rd Cir. 2013). [Police officers were denied promotion to Lieutenant because of their known support of a former police chief that had engaged in protected conduct.][4]

**B.**  **Plaintiff has presented sufficient evidence of a relationship with individuals within a protected class to satisfy the *Thompson* standard.**

As the foregoing authorities indicate, the nature of the relationship between DonMoyer and the women who reported to him easily qualifies him for standing under the *Thompson* rationale. The governing principle here is not so much a matter of degree as it is a matter of establishing a plausible motivational nexus between actions directed at protected individual and actions directed at the individual claiming third-party standing. In other words, a strong personal relationship helps

---

[4] See also Plaintiff's response to Defendants' Motion to Dismiss (Doc. 42) at p. 8.

to establish a case for standing in light of Title VII's express purpose of compensating all persons targeted for harm due to motives and actions prohibited under the Act, but it is not indispensable to standing. As noted above, *Thompson* explicitly did not limit the zone of interest to only close family relationships and its protections have been applied to persons with comparatively weak personal relationships. The main consideration is not the strength of the relationship, but whether the relationship is such that what motivates action against a protected class also motivates action against a third person.

With these observations in mind, Plaintiff's affidavit submitted with this motion essentially verifies what he alleged in his Supplemental Complaint. It establishes that his relationship to the women who reported to him would logically make him a target as well. Their performance was integral to his own success (to both his performance and compensation), and he devoted considerable time and energy to their recruitment, training, mentoring, and to assessment of their roles. Moreover, his work with them on a daily basis established bonds of friendship. His relationship with these women was a natural and logical obstacle to the intention formed at home office (by O'Neil and Austin), preceding McCann's arrival, to terminate the womens' employment. Plaintiff's relationship with the women was therefore more than sufficient under *Thompson* to include him in the class of protection that they occupied. (See Plaintiff's Separate Statement Additional Disputed Fact (PSAF) ¶¶ 2, 6, 18.)

**C.     Plaintiff has presented evidence sufficient to establish a triable claim for a retaliatory failure to promote him to the position of CEO.**

In their motion, Defendants' concede to a fact-proving process endorsed by the Supreme Court in the case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). This process requires that the aggrieved plaintiff initiate the proof of his or her claim by making a *prima facie* case of discrimination. A *prima facie* case shifts the burden of production to the employer to

present evidence of a legitimate, non-discriminatory reason for its actions, at which point the burden shifts back to the plaintiff to present evidence that the proposed reason is pretext. Evidence of pretext is sufficient to allow a trier of fact to decide the claim based on all the evidence of discriminatory motive. Defendants argue that DonMoyer does not have sufficient evidence to make a *prima facie* case on his retaliation claim because Duke Austin claims that he decided not to promote DonMoyer and that he was unaware of DonMoyer's opposition to discrimination.[5]

A retaliation claim may be proven by direct or circumstantial evidence. Direct evidence would be in the form of statements by a corporate agent that actions against the plaintiff were motivated by his or her opposition to discrimination. Circumstantial evidence often consists of the demonstration of a temporal relationship between Plaintiff's protected conduct and the denial of promotion. (*See Metzler v. Federal Home Loan Bank of Topeka* 464 F. 3d 1164, 1171-1172 (10th Cir 2006).) Defendants correctly point out that the issue of motivation to deny a promotion requires evidence sufficient to support the inference that DonMoyer's opposition to discriminatory behavior was known by the decision-maker. However, Defendants are incorrect in their conclusion that there is no evidence of such knowledge. There is ample direct and circumstantial evidence that DonMoyer's opposition to the discriminatory behavior of the men in construction played an active role in the decision to deny him promotion to QPI CEO.

---

[5] Defendants do not contest Plaintiff's "failure to promote" claim based on associational discrimination, assuming that such a claim is authorized by *Thompson.* Plaintiff's response is therefore directed at the Defendants' objection to Plaintiff's "failure to promote" claim based on retaliation. Plaintiff's burden in making a *prima facie* case in an associational claim is lighter. The threshold in disparate treatment claim based on Plaintiff's associational discrimination is satisfied by circumstantial evidence showing that Plaintiff was—by virtue of his association with his female executives—a member of the protected class, that Quanta was aware of his membership in that class, and that he was qualified for the position he was denied.  In satisfying this threshold requirement, Plaintiff does not have to show that the job was given to an unprotected individual such as McCann, but that showing is nonetheless probative of discriminatory intent to satisfy the *McDonnell-Douglas* threshold requirement. *See Kendrick v. Penske Transp. Servs, Inc.* 220 F. 3d 1220, 1226-1229 (10th Cir, 2000).

1.      **Quanta has made verbal admissions as direct evidence in support of DonMoyer's failure to promote claims.**

        **a. The Trawick meeting.**

The importance of the Trawick meeting is that (1) Trawick was a corporate agent acting within the scope of his authority, (2) he communicated his superiors' discomfort with the pressure DonMoyer was exerting (through his female executives) on the men in construction, (3) he diagnosed the problem as a "culture clash," (4) he acknowledged that DonMoyer had supportive relationships with the executive employees responsible for the escalation of that "clash"—presumably as the one who hired, trained, mentored, evaluated, and benefited from them, (5) DonMoyer's responded to Trawick to the effect that the "clash" involved the men's issue with the gender of his executives, (6) DonMoyer stated he opposed this hostility and was working to rectify it, and (7) this conversation preceded McCann's selection for CEO in January 2013. (PSAF at ¶ 10.)

Trawick's statements to DonMoyer qualify as party admissions under Federal Rule of Evidence 801(d)(2)(D) because they were made by a "party's agent or employee on a matter within the scope of that relationship and while it existed." Trawick was an employee of Quanta, and his investigation and counseling of DonMoyer were well within the scope of his employment.

The so-called "clash of cultures" represented the combined influences of EPC controls and gender hostility aggravated by those controls. Thus, Trawick's comment that DonMoyer was embedded in a "culture clash" allows the inference that DonMoyer was being called to task for his supportive relationships with the women that reported to him. Certainly the predominance of women in this "culture clash," accompanied by gender based insults, suggests that gender was a significant part of it. The fact that Trawick made the trip from Houston to Denver due to concerns communicated to him by his superiors, CEO O'Neil and COO Austin, while they were in the

process of deciding whether DonMoyer was going to succeed Laursen as QPI's CEO, gives rise to the inference that issues of "culture," including gender hostility, were active in the decision not to promote DonMoyer to CEO of QPI. The timing of this conversation (Fall 2012) and McCann's selection (January 2013) also supports the inference that DonMoyer was denied promotion either because of his relationship with these women or because he had taken their side on gender harassment issues raised by the men in construction.

A trier of fact could therefore infer from Trawick's corporate admissions that O'Neil and Austin knew of and were influenced by DonMoyer's protective stance toward his female executive employees in close proximity to the time when the adverse action against him occurred.

This inference is permitted based on Trawick's statements to DonMoyer about the state of mind of the home office superiors to whom he reported, Quanta CEO O'Neil and COO Austin, and should thus be imputed directly to them. As to DonMoyer's responses, it is reasonable to infer that Trawick would have reported DonMoyer's statements back to O'Neil and Austin due to the circumstances that prompted the meeting. Trawick was there because of concerns that his superiors had, he was in a reporting relationship to them, and he knew that they were considering QPI's next CEO. One can therefore infer that Trawick would have reported DonMoyer's opposition to discriminatory behavior back to O'Neil and Austin. This inference greatly undermines Quanta's argument for dismissal of DonMoyer's retaliation claim.

### b. McCann's announcement.

Apart from the significance of the Trawick conversation, statements by John McCann slam the door on Defendants' defense against DonMoyer's promotion claim. McCann's comments to DonMoyer and Laursen are important for the following reasons: (1) McCann had just arrived as Quanta's duly-appointed representative to bring changes to DonMoyer's organization, and he was

tasked on Quanta's behalf; (2) he explained Quanta's displeasure with the presence of women in construction, DonMoyer's support of the women, and his opposition to the men; (3) McCann's assignment included the reduction of the influence of women on the construction function; (4) he identified the CEO O'Neil, and not only Austin, as one who influenced the decision to select McCann; and (5) remarks of a threatening nature to DonMoyer coupled with an authoritative source for those threats designed to discourage DonMoyer from presenting resistance to McCann's assignment. McCann's comments are so redolent with implications that that list might be significantly longer, but it is clear from his statements that McCann identified that the reason for his selection (and the accompanying denial of DonMoyer's promotion) was to terminate the women, something that O'Neil and Austin apparently did not think DonMoyer would do because he had taken their side.   Although Defendants will presumably deny McCann's statement to DonMoyer, that McCann said these things and the fact that Laursen corroborates these statements, as well as circumstantial evidence that he acted on his stated intent strongly indicate that McCann was acting at the behest of those that selected him. (PSAF ¶ 15.)

### c. McCann's statements are admissions of a party made by an individual acting within the course and scope of his employment and are thus admissible under Rule 801(d)(2)(D).

Statements made by an employee acting within the course and scope of his or her employment are admissible under Rule 801(d)(2)(D) as direct evidence of the truth of the matter and are not regarded as hearsay (which would subject them to evaluation under the many exceptions to the hearsay rule). In the Title VII context, the relevant statements of someone tasked to discharge employment assignments are regarded as direct evidence of the truth of those statements. (*See Fischer v. Forestwood Company, Inc.* 525 F.3d 972, 984 (10th Cir. 2008) (reversing trial court exclusion of private comments between father (company president) and son

about reinstatement because the topic of reinstatement was raised, and that topic was within the scope of the father's employment).)

Plaintiff expects that Defendants will attempt to exclude McCann's statements as hearsay, based either on the argument that McCann was not employed by Quanta or that his statements were not authorized. Since Defendants have refused to admit to McCann's employment with Quanta, it is necessary to treat this issue as among those subject to trial. There is substantial evidence that McCann was, at a minimum, jointly employed by Quanta and QPI and, given Quanta's interest in hiring McCann as a change agent, acting at the direct behest of Quanta.

Defendants admit that Quanta hired McCann to the role of CEO and assigned him the task of making QPI leaner, which was directed specifically at the excessive utilization of control personnel typical of an EPC company. McCann's employment at QPI was comparable to DonMoyer's employment at QPG, and, in response to a request for admission, Defendants stated that they will not oppose the proposition that DonMoyer was jointly employed by Quanta and QPG. McCann never, from the beginning to the end of his term of employment as QPI-CEO, reported to or conversed with members of QPI's board of directors, and, in his deposition, he was unsure whether there was a board of directors. QPI, as a corporate entity, did

not exercise even the slightest degree of control over McCann. It cannot therefore be credibly disputed that McCann was an employee of Quanta. (PSAF ¶ 16.)

Defendants may alternatively contend that McCann's comments were outside the scope of his employment, because McCann did not select himself as CEO nor reject DonMoyer for that position. Such a contention, however, would ignore the fact that while McCann may not have influenced or been involved in the CEO selection, his selection was due largely to the assignment with which he was tasked. If he had, for example, assumed the CEO position with no obligation to terminate women, or to interface with DonMoyer about such actions, Defendants might argue that statements about the reasons for his selection as CEO were outside his authority. But that is clearly not the case. McCann was tasked to make personnel cuts to DonMoyer's organization and to interface with DonMoyer in the process of doing so. His description of O'Neil and Austin's dislike of DonMoyer's support of the women reporting to him, and the identification of his (McCann's) own assigned purpose of taking actions that DonMoyer would likely resist, is now direct evidence that supports  a number of inferences relevant to this action, including why DonMoyer was not promoted and why McCann proceeded as he did following his appointment as CEO.[6]

---

[6] In *Kidder v. Intel Corporation,* 2014 WL 12567157 (D.N.M. 2014) the district court discussed two Tenth Circuit cases, *Rainbow Travel Service v. Hilton Hotels Corp.*, 896 F.2d 1233 (10th Cir. 1990) and *Jaramillo. v. Colo. Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005). *Kidder* involved the casual statement of an engineer while on the job to the effect that plaintiff had been exposed to lead poisoning. The statement was allowed as an admission that refuted defendants' claim to a lack of knowledge of that hazard because it was part of the engineer's job to know about lead on the jobsite, even though it was not the engineers job to protect the plaintiff from it. In its analysis, the court in *Kidder* distinguished that situation from that in *Jaramillo*, where plaintiff offered testimony as to the statement of another employee who benefitted from, but did not participate in, the employment decision adverse to the plaintiff. There the comment was disallowed as a corporate admission because knowing the basis of the employment decision was not within the scope of that employee's work assignment. In clarifying the proper use of Rule 801(d)(2)(D), the court aligned its decision with *Rainbow Travel*, in which the Tenth Circuit allowed evidence of the statement of a bus driver in plaintiffs' suit against the Fontainebleau Hotel for switching them to less attractive lodging than they had been promised. The court allowed plaintiffs to testify as to bus driver's comments about what he was asked

**d. Quanta cannot interpose the corporate identity of QPI as a barrier to McCann's admission.**

Assuming *arguendo* that McCann was acting only as QPI's agent, such a claim would beg the question whether QPI was itself acting entirely at the behest of Quanta. Per the classic doctrine of alter ego, there is overwhelming evidence that QPI functioned under Quanta's complete dominion. *See Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc.,* 878 F.2d 1259 (10th Cir. 1989). The courts are called upon to apply the doctrine of alter ego where: (1) The stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; (2) there is such a unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and (3) to adhere to the fiction of the corporate entity would promote injustice or protect fraud. *Fink v. Montgomery Elevator Co, of Colo*., 421 P.2d 735 (1966); *Hill v. Dearmin,* 609 P.2d 127 (Colo.App. 1980); *Rosebud Corp. v. Boggio,* 561 P.2d 367 (Colo.App. 1977). The "fraud" or "injustice" that the Court would prevent by applying this doctrine consists of Quanta's attempt to avoid accountability for the admissions of one of its agents while carrying out Quanta's assigned task.

The application of the common law doctrine of alter ego appears to be unnecessary in this in the Title VII context because the courts—using the alter ego rationale—have adopted what is known as the integrated enterprise doctrine to merge affiliated entities into a single employer for purposes of evaluating a Title VII claim. This doctrine operates similarly to alter ego except that it does not require a complete unity of interest as the basis of its assertion. (*See Trevino v. Celanese*

---

to do and how often he had been asked to do it (which reflected badly on the intentions of his employer). The driver did not make the decision to switch plaintiffs' lodgings, but since his comments were about matters relevant to the discharge of his task as bus driver, the plaintiffs' reports of his statements were allowed.

*Corp.,* 701 F.2d 397, 404 (5th Cir.1983). Commenting on *Trevino*, in *Schweitzer v. Advanced Telemarketing Corp.* 104 F.3d 761, 763-764 (5th Cir. 1997) the court explained.

> *Trevino* set out a four part formula to determine when a parent corporation should be considered the employer of a subsidiary's employee. The formula focuses on *actual control* of employees by the parent company. The *Trevino* test has been used repeatedly in both this circuit and others to ascertain when distinct entities may be considered integrated as a single employer. *Trevino* 's [sic] four part test considers (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. The second of these factors has traditionally been most important, with courts refining their analysis to the single question, "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Id. at* 763-764

QPG and QPI were wholly owned subsidiaries of Quanta. There was no formal or informal reporting relationship to a board of directors, *i.e.,* QPI/QPG President and CEO did not engage with, report to or otherwise communicate in any significant way with QPG or QPI's boards of directors. Further, those boards consisted entirely of Quanta employees. The QPG-President and QPI-CEO roles were filled by decision-makers at Quanta (Quanta's COO and CEO) and reported directly to a Quanta corporate agent. Quanta frequently transfers employees between operating units. QPG and QPI chief executives' performance expectations were subject to review and approval by Quanta. As chief executives, they functioned under performance incentive contracts made directly with Quanta, They were subject to removal by Quanta without board authorization. Quanta provided legal counsel on matters of contract negotiation. Quanta directed and controlled all matters pertaining to litigation with QPG and QPI. Quanta guaranteed performance on contracts that these entities entered and engaged in a review and approval process for all significant contractual commitments. Quanta provided authorization for the coordination and contracting of working relationships and agreements among subsidiaries, including QPG and QPI, and it regularly intervened in the event there was conflict or dispute between subsidiaries. Quanta took all the profits from these entities, except for funds necessary to pay QPG/QPI's general and

administrative expenses, and transferred them to Quanta accounts. Quanta subsidiaries were subject to centralized Quanta Human Resources controls, and the discriminatory act (failure to promote) was committed by Quanta through a corporate agent under assignment to make personnel reductions. (PSAF ¶ 3.)

Those final considerations—centralized HR control and an adverse employment decision reposing in the parent as decision maker—per *Trevino* and *Schweitzer*, effectively merge Quanta and QPI for purposes of Defendants' motion. According to McCann, it was Quanta that hired him for the purpose of addressing issues related to the presence of women at QPI, which included getting DonMoyer out of the way.

### 2. There is significant additional evidence that circumstantially corroborates and clarifies Quanta's corporate admissions as expressed by Trawick and McCann.

Defendants' claim that Austin was entirely unaware of a controversy in DonMoyer's organization is, as in all evidentiary propositions, subject to evaluation as to its weight. This includes circumstantial evidence that discredits the evidence offered. There is evidence of McCann's real qualifications for the role he assumed, timing in the selection of McCann, pretext in the assignment of McCann to his role, and McCann's subsequent actions against women that circumstantially discredit Austin's claim that he was oblivious to the controversy.

#### a. Comparison between McCann and DonMoyer.

DonMoyer's membership by association in a protected class and Quanta's divergence from QPI's succession plan, viewed together with a comparison of DonMoyer's and McCann's qualifications, tend to prove DonMoyer was subject to discrimination because of his protected status. DonMoyer had extensive experience in all aspects of the management of EPC generation businesses. He had two and one half years of success at QPG, and he had his predecessor's

endorsement. McCann, on the other hand, had insufficient experience in EPC power generation to even be considered for the CEO role and had once been terminated by Quanta for performance issues associated with chronic alcohol abuse. Austin's acknowledgement of McCann's history of alcoholism and overzealous behavior, including threats to customers, can only be explained if Austin felt that his selection required a "honey badger," *i.e.*, someone who is oblivious to anticipated unpleasant resistance.. It is somewhat like hiring an inexperienced, unqualified thug to run a complex business. It doesn't make sense unless the purpose of the hire is to engage in offensive actions.. (PSAF ¶¶ 1, 12, 13)

### b. Evidence of timing

The timing of DonMoyer's meeting with Trawick—Fall 2012—coincides with the time frame in which Quanta was considering whether to follow QPI's succession plan to appoint DonMoyer as QPI's next CEO. McCann was offered the position of QPI in January 2013. Thus, the timing of Quanta evaluating DonMoyer's promotion and sending Trawick to intervene in private conversation with DonMoyer (a conversation that acknowledged a "cultural" divide that included issues raised against DonMoyer's female executives) constitutes *prima facie* evidence that DonMoyer was denied a promotion because he sided with the women who reported to him.

In addition to the timing of the Trawick conversation, there is further evidence that DonMoyer's construction personnel, namely Cowart, were making serious complaints in November 2012 and that these complaints were being relayed to Wisenbaker (Quanta's new sector manager reporting directly to COO Austin). Cowart was managing the QPG construction personnel and was aligned with their interest in opposing the women. He was on a first name basis with Quanta CEO O'Neil and threatened to quit on November 16, 2012, while O'Neil and Austin were considering whether to appoint DonMoyer as Laursen's successor. (PSAF ¶¶ 8, 9, 11.)

Defendants nonetheless contend that it is a matter of speculation whether or not such complaints reached Austin and that Austin's denial of knowledge of the "culture clash" and DonMoyer's position is final and unreviewable. The proximity of Wisenbaker (who received information about the controversy in DonMoyer's organization), as one reporting directly to Austin and assisting Austin in the selection of a new CEO, allows the inference that Austin was, in fact, aware of all this. A report to an employee on a matter that would ordinarily engage Austin as COO, and was necessary to Austin's selection of QPI's next CEO, allows the inference that the report was made. Therefore, in addition to Trawick's and McCann's corporate admissions, the fact of a controversy being reported to Austin's direct report, at a time when Austin was contemplating the appointment of a CEO to manage that controversy, allows the inference that Austin was informed. It is not mere speculation.

### c. Evidence of pretext

The fact that Austin later set forth clearly false reasons for his failure to promote DonMoyer further supports the inference that his claim of blindness to the controversy is likewise fabricated. A trier of fact, when confronted with evidence of intentional falsehood, is entitled, though not required, to disregard the witness's statement, and evaluate the facts based on the remainder of the evidence.

Defendants have offered two contradictory reasons for why Austin chose McCann.  The claim that McCann had been brought on to transform and expand QPI from an engineering and procurement company to a full scale EPC company was false. QPI had been a successful EPC company for over a year preceding McCann's arrival. Quanta failed to discuss this so-called "transformation" with Laursen or DonMoyer before deciding on the change. Moreover, Laursen denies saying that DonMoyer wasn't ready for the CEO position, as Quanta claimed in its response

to the EEOC, and denies ever feeling that way. (PSAF ¶¶ 20,21) The weight of Austin's first reason for denying promotion to DonMoyer is therefore entirely discredited.

The situation gets worse for Austin. Apparently acknowledging that his first proffered reason was not credible, he offers a second contradictory reason that that is also not credible. The claim that McCann was hired in order to trim (not to expand) the business due to a shrinking solar "pipeline" is false. Austin supposedly decided that this was necessary without talking with Laursen or DonMoyer. Laursen and DonMoyer told Quanta that the market was expanding. CEO O'Neil reported to Quanta shareholders on October 29, 2012, that QPG's business had expanded rapidly and that market conditions were favorable for expansion in the coming year. This expansion is confirmed by industry reports showing massive industry growth between 2012 and 2016. (PSAF ¶¶ 22,23)

While Defendants contend Quanta sent McCann to QPI to reduce overhead, QPI had low overhead by industry standards, and the other entities subject to McCann's oversight had much higher overhead yet were unaffected. In his deposition, Austin was unable to verify if, in fact, McCann had actually reduced overhead expenses. While he supposedly assigned McCann to the task of making the organization leaner, Austin's office approved an expansion of office space for QPG and QPI. Despite a claim that non-solar projects were the cause of excess overhead, the bidding of those projects continued after McCann's arrival, using QPI's capability in the execution of non-solar projects to win bids. (PSAF ¶¶ 24,25)

### d. McCann's actions after arrival in Denver.

If Austin was the one who selected McCann, and assigned McCann to his subsequent role, then McCann's actions after assuming the CEO position must be scrutinized in order to determine if McCann was acting independently or pursuant to the expectations of the one who placed him in

the role. Actions unaccompanied by evaluation and reflection are the kind of actions that occur by way of mandate from a superior, in this case, Austin.

McCann's actions following his arrival in Denver were not consistent with those of an individual attempting to learn about the organization he lead, but were consistent with the removal of an influence that he had been told was offensive by his superiors. He refused to meet with the women he terminated to assess their capability or the value of their contribution and ordered their terminations without consulting with DonMoyer and over DonMoyer's objections. The performance of the women had been excellent, and there was no reason for their termination. In evaluating McCann's subsequent conduct, a trier of fact is entitled to consider whether and to what extent McCann was influenced by someone else before he arrived, and in this instance the logical focus of that influence would be Austin. (PSAF ¶ 17)

## IV. CONCLUSION

The length of this response is due in significant part to Quanta's idiosyncratic corporate structure, which has in this instance raised the issue of whether McCann's statements about what he was going to do, and why, would be properly considered. It has therefore been necessary to set out the circumstances of his employment, the clash of cultures preceding his appointment as CEO, as well as the colorful history of contradictory and pretextual explanations all placed at the feet of the alleged decision maker, Austin.

Plaintiff's associational claim is viable. The evidence amply supports Plaintiff's claim for retaliatory failure to promote. Plaintiff therefore respectfully requests that the motion be denied.

DATED this 7th day of August 2017.

Respectfully submitted,

**LEVIN SITCOFF PC**

*s/Peter G. Friesen*
Peter G. Friesen
Elizabeth Walker
1512 Larimer Street, Suite 650
Denver, Colorado 80202
(303) 575-9390 telephone
(303) 575-9385 facsimile
pgf@levinsitcoff.com
eaw@levinsitcoff.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of August 2017, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system and served on the following by the method indicated which will send notification of said filing to the following email addresses:

Christine A. Samsel
Hanna Caplan
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
csamsel@bhfs.com
hcaplan@bhfs.com
*Attorneys for Defendants*
*Quanta Power Generation, Inc.*
*and Quanta Power, Inc.*

Robert G. Lian, Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
blian@akingump.com
*Attorney for Quanta Services, Inc.*

Brian G. Patterson
Courtney L. Stahl
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 45th Floor
Houston, TX 77002
bpatterson@akingump.com
cstahl@akingump.com
*Attorneys for Quanta Services, Inc.*

*s/ Nicole R. Peterson*
Nicole R. Peterson