IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 15-cv-01992-RPM

MICHAEL DONMOYER,

    Plaintiff,
v.

QUANTA SERVICES, INC. and
QUANTA POWER GENERATION, INC., and
QUANTA POWER INC.,

    Defendants.

---

ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT AND RELATED
PROCEDURAL MOTIONS

---

Plaintiff Michael DonMoyer alleges that Defendants Quanta Services, Inc. (QSI) and its wholly-owned subsidiaries, Quanta Power Generation, Inc. (QPG) and Quanta Power, Inc. (QPI), subjected five female former employees to gender-based discrimination and retaliation by harassing them, subjecting them to a hostile work environment, and demoting them and terminating their employment because of their gender and/or for complaining about discriminatory conduct. Those five women—Cynthia Cole, Patsy Baynard, Marta Farrell, Diane Giacomozzi, and Kimberly Kullen—were plaintiffs along with DonMoyer when this action was filed, but they have since settled and dismissed their claims.

Remaining in the case are DonMoyer's claims that because he hired and promoted the five female executives, maintained a close relationship with them, and resisted the hostility to which Defendants' employees subjected them, Defendants discriminated and retaliated against him as well. He alleges that Defendants failed to promote him from President of QPG to CEO of QPI, as previously promised, and instead hired a less qualified man, John McCann, who

expressed hostility to female employees, engaged in a pattern and practice of eliminating female employees at QPG and QPI and replacing them with men, and ultimately fired DonMoyer as well.

DonMoyer brings two claims asserting violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. The first alleges gender-based discrimination in Defendants' failure to promote him and termination of his employment. The second alleges the failure to promote and termination were in retaliation for his association with the female executives and his resistance to gender-based discrimination against them.

**Procedural Motions Related to the Motion for Partial Summary Judgment**

In support of his response to Defendants' Motion for Partial Summary Judgment, DonMoyer filed a Declaration setting forth his version of certain events and facts. *See* Doc. 91-1. Defendants filed a motion to strike all or portions of that Declaration asserting (1) it did not comply with Fed. R. Civ. P. 56 and 28 U.S.C. § 1746 because it did not state that it was "true and correct' and signed "under penalty of perjury"; and (2) some statements in the Declaration are not based on personal knowledge, are hearsay, or attempt to create sham issues of fact by contradicting DonMoyer's deposition testimony.

In response to the motion to strike, DonMoyer filed a Supplemental Declaration stating that he has personal knowledge of the matters stated, affirming that the Supplemental Declaration is made "under penalty of perjury," repeating the statements in the 25 paragraphs of the original Declaration, and adding five additional paragraphs purporting to "clarify" certain matters raised in Defendants' Motion to Strike. *See* Doc. 99-1. In reply, Defendants argue that all or at least the five new paragraphs of the Supplemental Declaration should also be stricken

because it is untimely, was filed without leave of the Court, and will prejudice Defendants.

Defendants' reply prompted DonMoyer to file yet another motion (Doc. 102), this time seeking leave after the fact to file the Supplemental Declaration. Defendants complain that this motion is also untimely and that the Supplemental Declaration should not be permitted because it contains new factual statements that are different or additional to what DonMoyer said in his deposition and it would be unfair and prejudicial to allow DonMoyer to just "toss them into the record" at this point.

The Court has reviewed the parties' arguments on these procedural issues and, without further belaboring the matter, finds and concludes that any argued inadequacy in the form of the original Declaration has been cured; that DonMoyer has shown sufficient cause to file the Supplemental Declaration; that Defendants' evidentiary objections go principally to the weight rather than the admissibility of the statements to which they are directed; and that none of those objections has sufficient merit to warrant striking any or all of either the original Declaration or the Supplemental Declaration.

**The Motion for Partial Summary Judgment**

The following facts are supported by evidence in the record:

QSI is a corporation with its principal place of business in Houston, Texas. Through a network of subsidiaries, QSI builds and maintains transmission and distribution infrastructure and provides related services to the electric power and oil and natural gas industries. QPI and QPG are wholly-owned subsidiaries of QSI, each with its principal place of business in Colorado. At the times relevant here, the CEO of QPI oversaw a group of QSI's subsidiaries, including QPG, and QPG reported to QSI through QPI. QPG provided construction services in

the fields of solar, natural gas, energy storage, fuel cell technology, and biofuels. QSI's management selected or approved the CEOs and Presidents of both QPG and QPI.

DonMoyer, a white man, is former President of QPG. He and Chris Laursen were engaged by QSI in 2010 to build a full service engineering / procurement / construction (EPC) company focused on coordinated marketing, bidding, engineering, procurement, and construction of renewable energy generation projects. The company was first incorporated as Quanta Renewable Energy Services, Inc. (QRES), and Laursen and DonMoyer became QRES's CEO and Executive Vice President, respectively. QRES was reorganized in 2011 and its name was changed to QPG. DonMoyer became President of Operations of QPG, and Jeffrey Schmidt became the President of Construction for QPG. In the spring of 2012, Schmidt left QPG, leaving DonMoyer as sole President of QPG.

In 2012, Laursen's CEO position, human resources, and certain administrative staff positions were moved to QPI, but DonMoyer continued to report to Laursen, who in turn reported to QSI. The corporate structure was such that QSI exercised direct management and control over many aspects of QPI's and QPG's businesses, including filling the roles of President of QPG and CEO of QPI, reviewing their performance, and determining their compensation and continued employment.

Laursen was expected to retire as CEO of QPI during 2013. DonMoyer had been promised a promotion to Laursen's position, and a succession plan submitted to QSI by QPI identified him as Laursen's successor. Instead, QSI hired John McCann as QPG's CEO, and his employment there began on April 1, 2013. In relatively short order, the employment of DonMoyer and the five female former plaintiffs was terminated.

4

The facts are disputed regarding the reasons for these adverse employment actions, but evidence submitted by DonMoyer supports his allegations that the firings resulted from his actions to hire, promote and support women in executive positions at QPG and QPI.

The EPC business model DonMoyer was engaged to build required centralized controls over project bidding, engineering, procurement, and construction. He and Laursen hired women to fill key executive positions that exercised audit and control functions affecting the autonomy of construction services companies under QPI supervision. The construction sector of QPG/QPI expressed resentment and hostility over these controls. Male construction workers directed insults toward female control personnel who reported to and were acting under DonMoyer's direction. One of DonMoyer's responsibilities was to deal with these issues. He informed construction personnel that their actions would not be tolerated and they were obligated to work with the women and comply with their directions. This did not sit well with construction management, causing at least three construction managers to leave, be removed, or be transferred. Two of the construction managers, Jeffrey Schmidt and Jack Cowart, had long-standing friendships with QSI CEO Jim O'Neil and COO Earl "Duke" Austin. Cowart, until his transfer from under DonMoyer's direction in April 2013, led the construction group that had directed insults toward female employees.

In the fall of 2012, QSI sector manager Ken Trawick—to whom Laursen reported directly and who reported directly to QSI's COO and CEO—made a trip to Denver for a private meeting with DonMoyer. Trawick told DonMoyer that men in construction were communicating discontent to DonMoyer's superiors at QSI, CEO O'Neil and COO Austin. Trawick did not say who was making the complaints, but referred to the tension as a "clash of cultures" and said that

DonMoyer needed to take measures to reduce pressures on the men in the construction sector. During the meeting, DonMoyer acknowledged the clash but clarified that much of it consisted of gender-based hostility directed by the men in construction towards the women who reported to DonMoyer. He stated that he felt they were making progress in resolving the issues.

McCann was offered the job of QPI CEO in January 2013. Before he was selected to be CEO, McCann's professional experience had principally involved telecommunications construction projects and included only limited time in a managerial role for a large energy project. He had once been employed by QSI as CEO of a telecommunications construction company, Conti Communications, where his work did not include direction of an EPC business model.

Neither DonMoyer nor Laursen was notified about McCann's hiring until shortly before his arrival in April 2013. On McCann's first day in Denver, he told DonMoyer that O'Neil and Duke Austin disliked DonMoyer and had wanted to terminate his employment five months earlier. He further stated that O'Neil and Austin told him there were too many women in management for a construction company, that DonMoyer was responsible for that, and that he (McCann) had been appointed as CEO to correct that problem. In a private conversation with Laursen on the same day, McCann stated: "Jim O'Neil thinks there's too many fucking women in the company, and I'm here to fix that."

After assuming the role of CEO at QPI in April 2013, McCann refused to meet with the female executives DonMoyer had hired. McCann terminated the employment of QPI Human Resources Director Cole, to whom vulgar comments had been directed during by construction employees, on June 4, 2013; Director of Project Management Baynard on August 1, 2013;

Director of Safety Kullen on September 9, 2013; and DonMoyer and QPG's in-house counsel, Farrell, who had joined DonMoyer in opposing the terminations of Cole, Baynard, and Kullen, on September 26, 2013. McCann also removed Giacomozzi from her role as cost controller (which involved controls over the construction sector), placed her in the role of director of business development, and terminated her from that role on July 23, 2014.

DonMoyer was significantly involved in hiring, training, mentoring, and evaluating all of these women, and developed working friendships with them. All reported to both DonMoyer and Laursen, and DonMoyer regarded them as crucial to the EPC organization he and Laursen had built and to his own successful performance and compensation at QPG.

Defendants seek summary judgment on both the failure to promote and termination aspects of DonMoyer's First Claim for Relief, for discrimination, arguing that he cannot establish a prima facie case of sex discrimination in violation of Title VII.

To establish a prima facie case of gender discrimination through circumstantial evidence, DonMoyer must show that he is a member of a protected class, he suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination. *Bennett v. Windstream Comm'ns., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). By its terms, Title VII prohibits sex discrimination only if it is based on a <u>plaintiff's own</u> gender. 42 U.S.C. § 2000e-2(a)(1) (providing that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of <u>such individual's</u> race, color, religion, sex, or national origin" (emphasis added)).

DonMoyer has submitted no evidence that he was discriminated against because he is

7

male, but rather claims he was discriminated against because of his association with and advocacy for the female executives he hired, promoted, and supervised. He has cited no case from the Tenth Circuit Court of Appeals recognizing a claim for associational gender discrimination—or even for discrimination based on association with members of another protected class, such as race. *See Salazar v. City of Commerce City,* No. 10-CV-01328-LTB-MJW, 2012 WL 1520124 *6 (D. Colo. May 1, 2012), aff'd, 535 Fed. App'x 692 (10th Cir. 2013) (noting the dearth of Tenth Circuit case law supporting a Title VII claim for national origin discrimination based on association).

Cases recognizing associational race discrimination claims reason that such discrimination is unlawful when the evidence reflects the employer's disapproval of the employee's interracial association, and thus is taking the plaintiff's own race into account. *See, e.g., Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (holding that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race").

DonMoyer has not cited and the Court is not aware of any cases employing a similar rationale in the sex discrimination context. Even if such a claim is cognizable in theory, DonMoyer has not produced any evidence supporting an inference that Defendants discriminated against him because they disapproved of the inter-gender association between him and his female subordinates, and thus that he was discriminated against because of his own gender, not theirs.

Plaintiff's heavy reliance on *Thompson v. North American Stainless, LP*, 131 U.S. 863 (2011), is not well-taken. *Thompson* was a Title VII retaliation case, and the Court explicitly

8

emphasized the difference between Title VII's anti-discrimination and anti-retaliation provisions. *Id.* at 173-74. The specific issue decided was whether an employee had standing to bring a Title VII claim after he was fired as retaliation against his fiancée, who had engaged in protected activity by filing an EEOC charge against the employer. *Id.* In applying a "zone of interest" analysis to determine whether the plaintiff was a "person aggrieved" for Title VII purposes, the Supreme Court emphasized that the plaintiff was not merely "collateral damage," but was fired as the intended means of harming his fiancée, in retaliation for her filing an EEOC charge. *Id.* at 178. The Court therefore determined that the plaintiff could sue for harm he suffered from the employer's action, even though he had not engaged in protected activity himself. *Thompson*'s analysis of that retaliation claim does not support DonMoyer's discrimination claim here.

With regard to DonMoyer's retaliation claim, Defendants move for summary judgment only as to the failure to promote, and not as to the termination of his employment.

Retaliation against an employee for opposing any practice made unlawful by Title VII is forbidden. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015). A plaintiff must establish that retaliation "played a part in the employment decision" and may meet that burden through either direct or circumstantial evidence. *Id.* at 1233. If the latter route is chosen, courts apply the three-part *McDonnell Douglas* framework, the first step of which is to establish a prima facie case of retaliation by proving "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* at 1233–34 (10th Cir. 2015) (quoting *Argo v. Blue Cross &*

9

*Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir.2006)).

The Tenth Circuit has cautioned, in the context of employment discrimination cases, that "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Id.* at 1220-21 (quoting *Randle v. City of Aurora,* 69 F.3d 441, 453 (10th Cir.1995)). "Consequently, 'in this Circuit ... an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct].'" *Id.* (quoting *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1177 (10th Cir.1998) (Tacha, J., concurring in part)).

Defendants argue that DonMoyer cannot establish the third element of a prima facie case of retaliation—that a causal connection existed between Defendants' decision not to promote him and any of his alleged protected activity in supporting his female employees.[1] Specifically, Defendants contend that the undisputed evidence shows that the person who made the decision to hire McCann as CEO of QPI rather than promote DonMoyer was QSI CEO Duke Austin and that Austin has testified that he had no knowledge when he made that decision of any complaints by DonMoyer about discriminatory treatment or of any actions taken by DonMoyer to prevent or

---

[1] DonMoyer has produced evidence to support his argument that Defendants have given inconsistent, pretextual business reasons for not promoting him. Evidence that Defendants gave inconsistent reasons for not promoting DonMoyer circumstantially supports DonMoyer's claim that the actual reason was retaliatory. It should be noted, however, that Defendants' motion for partial summary judgment argues only that DonMoyer cannot prove causation, the third element of a prima facie case of retaliation. The motion does not invoke the second and third steps in the *McDonnell Douglas* framework by asserting that even if DonMoyer can prove a prima facie case, summary judgment is appropriate because there were legitimate grounds for not promoting him. The motion therefore does not place the burden on DonMoyer to prove pretext at this stage of the case. *See Lounds*, 812 F.3d at 1234.

address discrimination or retaliation.

Here, DonMoyer has produced evidence sufficient to permit an inference by the finder of fact that QSI's decision not to promote him was causally related to his actions in hiring, promoting, and supporting the female executives under his supervision and control and taking steps to curtail discriminatory and harassing actions against them.

Duke Austin's self-serving and carefully-worded statements and denials about what he knew or did not know when he decided not to promote DonMoyer are not sufficient to overcome, on summary judgment, the potential inferences a jury could draw considering all of the evidence in the record. That evidence provides a basis to find that Defendants' top management—including not only Austin but also O'Neil and Trawick and others—were aware before McCann was hired that there had been hostile, discriminatory, and harassing behavior directed against female personnel; that DonMoyer had resisted that behavior; that male management employees such as Schmidt and Cowart had communicated to QSI's management their dissatisfaction about the employment of women in positions of control over the previously autonomous construction sector of the business; that in the inter-related management structure in the Quanta companies it was plausible (and even likely) that Austin, as COO of QSI, was aware of the problems when the non-promotion decision was made; and that McCann, as he put it, was selected as QPI's CEO rather than DonMoyer to deal with the problem of "too many fucking women" in management. Given the evidence, a jury could choose not to believe Austin's denial of any knowledge that would support finding a retaliatory motive. Similarly, accepting Defendants' narrow and argumentative reading of DonMoyer's deposition testimony about his communications with Austin and other management personnel would require the Court to

11
11

improperly weigh the evidence and draw its own inferences from it, rather than leave the fact-finding for trial.

In short, there are genuine issues of material fact about whether the decision not to promote DonMoyer was causally related to activities protected by Title VII.

Based on the foregoing, it is

ORDERED that Defendants' Motion to Strike the Declaration of Michael DonMoyer (Doc. 96) is DENIED; it is

FURTHER ORDERED that Plaintiff's Motion Seeking Leave to File Supplemental Declaration in Opposition to Defendants' Motion for Partial Summary Judgment (Doc. 102) is GRANTED; and it is

FURTHER ORDERED that Defendants' Motion for Partial Summary Judgment (Doc. 88) is GRANTED with regard to Plaintiff's First Claim for Relief alleging gender-based discrimination under Title VII; and DENIED with regard to Plaintiff's Second Claim for Relief alleging retaliation for protected activity under Title VII.

DATED: November 9, 2017

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge